IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

THE UNITED STATES OF AMERICA, and
THE STATE OF MISSISSIPPI
*ex rel,* W. BLAKE VANDERLAN, M.D.                                    **PLAINTIFFS**

SOUTHERN DISTRICT OF MISSISSIPPI
FILED
OCT 23 2015
ARTHUR JOHNSTON
BY _____ DEPUTY

V.                                                CAUSE NO. 3:15cv767DPJ-FKB

JACKSON HMA, LLC d/b/a
**Central Mississippi Medical Center;**                               **DEFENDANTS**
                     **and**
**MERIT HEALTH CENTRAL - JACKSON**
successor in interest to
Jackson HMA, LLC d/b/a
**Central Mississippi Medical Center**

**JURY TRIAL DEMANDED**

FILED *IN CAMERA* AND UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)
RELATOR'S COMPLAINT FOR DAMAGES
UNDER THE FALSE CLAIMS ACT- 31 U.S.C. §§ 3729, *et. seq.*

COMES NOW Plaintiff/Relator W. Blake Vanderlan, M.D. ("Relator or Dr. Vanderlan")

and files this his Complaint as Relator acting on behalf of the United States of America and the

State of Mississippi, as follows:

SUMMARY OF THE CASE

1.      This is an action to recover damages and civil penalties on behalf of the United

States of America and the State of Mississippi arising out of false claims presented for payment

and payments/fines falsely avoided by Jackson HMA, LLC d/b/a Central Mississippi Medical

Center and its successor in interest Merit Health Central - Jackson ("CMMC-Merit").

2.      CMMC-Merit has knowingly or with reckless intent made and presented to the United States of America (the "Government") false claims in violation of the Federal Civil False Claims Act, 31 U.S.C. §§ 3729, *et. seq*. ("FCA").  The violations of the FCA involve CMMC-Merit's claims for reimbursement from Medicare and Medicaid presented to the Government from April 2013 (and possibly earlier) through the present, and CMMC-Merit's avoidance of penalties and fines for additional violations of federal and state laws.

3.      CMMC-Merit opted into *The Emergency Medical Treatment and Active Labor Act* ("EMTALA"), 42 U.S.C. § 1395dd, as a condition of receiving payments from Medicare and Medicaid.  As explained in detail below, CMMC-Merit engaged in a systematic and fraudulent practice of claiming compliance with EMTALA while submitting claims to the Medicare and Medicaid reimbursement programs during the relevant time frames.  Each claim (totaling millions of dollars per year) has been false and fraudulent in that each carried with it a false certification that CMMC-Merit satisfied the regulatory conditions for payment, i.e., that CMMC-Merit's emergency department was fully compliant with the requirements of EMTALA.  Each claim falsely presented is a separate "false claim" subjecting CMMC-Merit to criminal sanctions, 42 U.S.C. § 1320a-7b, and civil fines, 42 U.S.C. § 1320a-7a.

4.      In order to receive payments under the Medicare and Medicaid programs, a hospital must meet the requirements established under Title XVIII of *The Social Security Act*, 14 U.S.C. § 1395, *et seq.*, commonly known as *The Medicare Act*, as well as the regulations established by the Secretary of Health and Human Services.  During the time frame at issue, CMMC-Merit falsely certified compliance with EMTALA, such violations being commonly known as "patient dumping."  Compliance with the requirements of EMTALA is a condition for

-2-

payment under the Medicare and Medicaid reimbursement programs.  42 U.S.C. § 1395cc (a)(1)(I)(i).

5.        On May 13, 2015, this Supplemental Counterclaim and Third Party Complaint became justiciable when the Center for Medicare and Medicaid Services ("CMS") issued a written determination to CMMC-Merit of multiple ongoing violations under the Social Security Act, which "constitute an immediate threat and jeopardy to the health and safety to any individual who comes to [CMC-Merit] with an emergency medical condition."  **Exhibit "1"**.

6.        CMS's written determination of ongoing violations arose from an investigation authorized in response to detailed information provided to CMS by Dr. Vanderlan.  **Exhibit "2"**. On May 14, 2015, at the completion of its investigation, CMS instructed Dr. Vanderlan "to consider the civil enforcement provisions of §1867 of the [Social Security] Act (i.e., EMTALA) on an independent basis," thereby creating the basis for this civil pleading.  **Exhibit "2"**.

7.        Congress enacted EMTALA out of concern that, due to economic constraints, hospitals were abandoning the traditional practice of providing emergency care to all comers. Instead, hospitals were refusing to treat certain indigent patients, and/or transferring such patients to other institutions.

8.        During the time frame at issue, CMMC-Merit engaged in repeated and systematic acts of "patient dumping" in violation of EMTALA.  CMMC-Merit intentionally and purposefully hid it's EMTALA violations from various investigating administrative agencies.

9.        CMMC-Merit's purpose was to hide it's non-compliance in order to allow CMMC-Merit to continue submit claims for payment under the Medicare and Medicaid reimbursement programs.  CMMC's additional purpose was to falsely and fraudulently avoid

payment of required EMTALA violation fines. 42 U.S.C. § 1395dd(d)(1)(A). During the time

frame at issue, each claim submitted to the Medicare and Medicaid reimbursement programs and

each fine falsely avoided is a separate "false claim" subjecting CMMC-Merit to criminal

sanctions, 42 U.S.C. § 1320a-7b, and civil fines, 42 U.S.C. § 1320a, 7a.

     10.     The Mississippi Legislature created Mississippi's Trauma Care System to reduce

the death and disability resulting from traumatic injury. Mississippi Law requires every

Mississippi licensed acute care facility to participate in the statewide trauma care system at a

level commensurate with the abilities of its staff and resources available. Hospitals can elect

"Non-Participation" and are then required to pay a non-participation fee which is based upon

their capability. Level II facilities pay a non-participation fee based upon their capability as a

Level II center, Level III facilities pay a non-participation fee based upon their capability as a

Level III center, and so on.

     11.     During the time frame at issue, CMMC-Merit held itself out and continues to hold

itself out as a Level III trauma center. CMMC-Merit has neurosurgery coverage. CMMC-Merit

has the capability to participate in the Mississippi Trauma Care System as a Level II facility.

     12.     CMMC-Merit has failed and continues to fail to participate in the Mississippi

Trauma Care System at a Level commensurate with its capabilities, including, but not limited to,

the following: 1) through the repeated and systematic failure to have available surgeons willing

to provide required treatment for trauma patients presenting to CMMC-Merit's Emergency

Department; and, 2) repeated and systematic acts of patient dumping.

     13.     CMMC-Merit's purpose was and is to falsely and fraudulently avoid payment of

the required Mississippi Trauma System Non-Participation Fee. Each non-participation fee

-4-

falsely avoided is a separate "false claim" subjecting CMMC-Merit to criminal sanctions, 42 U.S.C. § 1320a-7b, and civil fines, 42 U.S.C. § 1320a-7a.

14.     Each false claim submitted is recoverable under the False Claims Act.  Each fine and/or payment falsely and fraudulently avoided is recoverable under the False Claims Act.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and § 1367 (supplemental jurisdiction).  This Court also has exclusive jurisdiction pursuant to 31 U.S.C. §§ 3730(b), 3730(h), 3732(a), and 3732(b) which confer jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730. Title 31 U.S.C. § 3732 provides: "Any action under Section 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act prescribed by Section 3729 occurred.  A summons as required by the Federal Rules Civil Procedure shall be issued by the appropriate district court and served at any place within or outside the United States."

16.     As established by the pleadings, Defendant Jackson HMA, LLC d/b/a Central Mississippi Medical Center transacted business in this judicial district and this action may only be brought in the United States District Court for the Southern District of Mississippi.

17.     As established by the pleadings, Defendant Merit Health Central - Jackson, successor in interest to Jackson HMA, LLC d/b/a/ Central Mississippi Medical Center, transacts business in this judicial district and this action may only be brought in the United States District Court for the Southern District of Mississippi.

## PARTIES

18.     The United States Government and The State of Mississippi appear in this action

through Relator W. Blake Vanderlan, M.D. ("Relator or Dr. Vanderlan").  Relator is a citizen of

the United States and is an adult resident citizen of the State of Louisiana.  In April 2013,

Dr. Vanderlan joined the CMMC staff with full general surgical privileges, critical care

privileges and emergency medical privileges.  Dr. Vanderlan was later assigned the position of

Trauma Director, without surgical privileges.  Upon joining CMMC, Dr. Vanderlan joined JMS

Burn Center as a general surgeon and burn intensivist.   As a result of Dr. Vanderlan's positions

with CMMC and the JMS Burn Center, Dr. Vanderlan witnessed the events set forth herein.

Relator Dr. Vanderlan seeks recovery under the False Claims Act on behalf of the United States

Government and The State of Mississippi.  31 U.S.C. § 3730(b).

19.     Pursuant to Fed.R.Civ.P. 4(i)(1), a copy of this Court's summons and the

Complaint shall be served via certified mail on: Loretta E. Lynch-Attorney General of the United

States, U.S. Department of Justice, 950 Pennsylvania Avenue, NW, Washington, DC 20530-

0001; and, via hand delivery on: Mitzi Dease Paige - Assistant United States Attorney for the

Southern District of Mississippi, Attn. Samuel Lynn Murray, Office of the U.S. Attorney-Civil

Division, 501 E. Court Street, Suite 4.430, Jackson, MS 39201-5025.

20.     Upon approval by the United States Government, and order of the Court if

necessary, a copy of this Court's summons and the Complaint shall be served pursuant to 31

U.S.C. § 3732(b) on: Jim Hood- Attorney General for the State of Mississippi, 550 High Street,

suite 1200, Jackson, MS 39201.

21.     Defendant Jackson HMA, LLC d/b/a Central Mississippi Medical Center, during the times complained of herein, had its principal place of business located at 1850 Chadwick Drive, Jackson, Mississippi 39204. At all times material to this Complaint, Jackson HMA owned and operated CMMC in Jackson, Mississippi through which it offered healthcare and other services for which it accepted payment from the subject healthcare reimbursement programs. Upon order of the Court, a copy of this Court's summons and the Complaint shall be served on Jackson HMA's registered agent for service of process: CSC of Rankin County, Inc., Mirror Lake Plaza, Suite 1502, 2829 Lakeland Dr., Flowood, MS 39232.

22.     Defendant Merit Health Central - Jackson has its principal place of business located at 1850 Chadwick Drive, Jackson, Mississippi 39204. Merit Health Central - Jackson is the successor in interest to Jackson HMA/CMMC in Jackson, Mississippi through which it offered healthcare and other services for which it accepted payment from the subject healthcare reimbursement programs. Upon order of the Court, a copy of this Court's summons and the Complaint shall be served on Merit Health Central's registered agent for service of process: CSC of Rankin County, Inc., Mirror Lake Plaza, Suite 1502, 2829 Lakeland Dr., Flowood, MS 39232.

23.     Merit is the corporate successor of the pre-existing entity, Jackson HMA. By operation of law and/or by contract, Merit is responsible for all actions, statements, misrepresentations, omissions and liabilities of its core predecessors, including, but not limited to, Jackson HMA. Jackson HMA/CMMC and Merit will be collectively referred to as "CMMC-Merit."

## SOURCE AND DISCLOSURE OF MATERIAL INFORMATION

24.     Relator Dr. Vanderlan was the Chairman of Clinical Outcomes Committee existing under the direction of the Central Mississippi Region Trauma Committee which was responsible for reviewing all trauma patient transfers and compliant matters in the Region encompassing CMMC-Merit.   Relator Dr. Vanderlan is the original source of the information underlying the allegations herein.  Dr. Vanderlan brings this action pursuant to the authority of 31 U.S.C. § 3730(b).

25.     A copy of this pleading and the evidentiary disclosures required by the False Claims Act are being served on the U.S. Attorney for the Southern District of Mississippi - Civil Division, 31 U.S.C. § 3730(b)(2), and will be served on the Attorney General for the State of Mississippi - Office of Civil Litigation, 31 U.S.C. § 3732(b).

## FEDERAL AND STATE PROGRAMS HARMED

26.     The Department of Health and Human Services ("HHS"), through the Center for Medicare and Medicaid Services ("CMS") funds and administers the Medicare program, which is a system of healthcare insurance for the aged and disabled created under Title XVIII of *The Social Security Act*, 42 U.S.C. § 1395, *et. seq.*.

27.     Through CMS, HHS also provides funds for the State of Mississippi's Medicaid programs, which insures certain groups, including the poor and disabled, and which is funded in part from federal funds and in part from the state where the facility is located. 42 U.S.C. §§ 1396, *et. seq.*

28.     EMTALA was enacted by Congress in 1986 as part of *The Consolidated Omnibus Budget Reconciliation Act* ("COBRA"). 42 U.S.C. §1395dd.  Referred to as the "Anti-Dumping

Law," EMTALA was designed to prevent hospitals from transferring uninsured or Medicaid patients to public hospitals without, at a minimum, providing a medical screening examination to insure that the patients were stable for transfer.

29.     After its enactment, EMTALA became the *de facto* National Health Care Policy for the uninsured seeking emergency medical treatment or trauma care.  EMTALA requires Medicare-participating hospital emergency departments to provide a medical screening to anyone who enters an emergency room and requests an examination for a medical condition.  42 U.S.C. § 1395cc(a)(1)(I)(i).

30.     If an emergency medical condition is diagnosed, the participating hospital must provide medical services to stabilize the condition, consistent with such hospital's capabilities. 42 U.S.C. § 1395dd(b)(1)(a)-(b).  Participating hospitals are required to treat the emergency medical conditions of patients in a non-discriminatory manner, regardless of their ability to pay, insurance status, national origin, race, creed or color.  42 U.S.C. § 1395dd(h).

31.     During the relevant time frame, CMMC-Merit as a participating hospital agreed to meet the requirements of EMTALA.

32.     In order to received payments under the Medicare and Medicaid reimbursement programs, participating hospitals as providers of service are obligated to file certain agreements and certifications with the Secretary of HHS.  42 U.S.C. §1395cc.

33.     In the case of a hospital or critical access hospital, such hospital, as a condition for payment, must adopt and enforce a policy to ensure compliance with the requirements of EMTALA, and meet the requirements of EMTALA.  42 U.S.C. §1395cc(a)(1)(I)(i).

34.     CMMC-Merit as a participating hospital agreed to adopt and enforce a policy to ensure compliance with the requirements of EMTALA, and meet the requirements of EMTALA, as a condition for payment under the Medicare and Medicaid reimbursement programs.

35.     Annual agreements and/or certifications were made by CMMC-Merit during the relevant time frame.  In such annual agreements/certifications, CMMC-Merit knowingly, intentionally, and falsely concealed CMMC-Merit's non-compliance with EMTALA and certain other state regulations, as described more fully herein.

36.     CMMC-Merit must, with respect to each patient who is a beneficiary of a Medicare or Medicaid program, submit a claim reimbursement form, Form UB-04 a/k/a Form CMS-1450.  On each form (totaling many thousands per year during the relevant time frames), CMMC-Merit expressly certified: "...payment and satisfaction of this claim will be made from Federal and State funds, any false claims, statements, documents, or concealment of any material fact, may be prosecuted under applicable Federal or State laws."  Form UB-04 (Form CMS-1450).

37.     Certifications were made by CMMC-Merit during the relevant time frames with respect to each patient that CMMC-Merit submitted a claim reimbursement form, including, but not limited to, patients whose treatment violated the requirements of EMTALA.

38.     The United States Government, acting through its relevant agencies (HHS, CMS) had a right to rely, and did rely, upon the representations and statements made by CMMC-Merit in connection with claims submitted for reimbursement during the relevant time frames, including the certification that CMMC-Merit had and was providing healthcare services under

circumstances satisfying all of Medicare and Medicaid's conditions of payment, including

EMTALA.

      39.     Each condition for payment in the Medicare and Medicaid programs is essential.

A failure to satisfy any condition of payment, coupled with the knowing submission of a claim

for reimbursement for services that were rendered when CMMC and Merit was not in

compliance with the reimbursement program conditions constitutes a false and fraudulent claim

under 31 U.S.C. §§ 3729, *et. seq.*.

      40.     Specifically, CMMC- Merit made false and fraudulent claims seeking

reimbursement from Medicare and Medicaid for services rendered when the following

circumstances were present:

     a.     CMMC failed to comply with the applicable federal laws relating to the health and safety of patients, 42 C.F.R. § 482.11(a), including failure to comply with EMTALA, 42 U.S.C. § 1395dd, i.e. patient dumping.

     b.     Additional violations of federal law and regulations will be proven at trial.

      41.     A facility that discovers or is made aware of material errors or omissions in claims

submitted for reimbursement to Medicare and Medicaid is required to disclose those matters to

the government.  Facilities are not free to keep money that results from such errors, or to conceal

such errors, or to retaliate against those who endeavored to correct them, e.g., Relator Dr.

Vanderlan.  Title 42 U.S.C. § 1320(a)-7(b)(a)(3) creates a duty to disclose such errors by making

a failure to disclose a felony, as follows:

          Whoever . . . having knowledge of the occurrence of any event effecting (A) his initial or continued right to any such benefit or payment . . . conceals or failed to disclose such event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity that is due or when no such benefit or payment

> is authorized . . . shall (i) in the case of such statement,
> representation, concealment, failure . . . be guilty of a felony.

Accordingly, CMMC-Merit had and continues to have an affirmative duty to disclose material

information which indicates their reimbursement claims are inaccurate.

42.     As a participating hospital, CMMC-Merit was and continues to be subject to fines

and civil penalties for each negligent violation of EMTALA. 42 U.S.C. § 1395dd(d)(1)(A).

43.     The Mississippi Legislature created the State Trauma Care System to "reduce the

death and disability from traumatic injury." Mississippi law requires every Mississippi licensed

acute care facility to participate in the statewide Trauma Care System. Facilities are designated

as Levels I-IV trauma centers based on specific criteria, including the services each facility

offers. Any hospital that chooses not to participate in the Trauma Care System or that

participates at level lower than the level at which it is capable of participating, as determined by

the Mississippi Department of Health, must pay non-participation fee. Joint Legislative

Committee on Evaluation and Expenditure Review (PEER), *Report the Mississippi Legislature*

(January 3, 2013).

44.     The Mississippi Legislature established the Mississippi Trauma Care Systems

Fund ("MS Trauma Fund") for use by the State Department of Health in the administration and

implementation of the comprehensive State Trauma Care Plan. The MS Trauma Fund receives

revenues, in part, from penalties assessed against hospitals that choose not to participate in the

state's trauma care system, or that participate at a level lower than the level at which it is capable

of participating. *Id.*

45.     The Mississippi Department of Health uses MS trauma fund to cover

administrative expenses of the State Trauma Care System. Beginning in fiscal year 2010, the MS

Department of Health continued to use the MS Trauma Fund to cover administrative expenses of the System, but also distributed the remaining balance in a formulated manner based on each hospitals specific designation as a trauma center. *Id.*.

46.    In August 2013, then Jackson HMA/CMMC, requested a Certificate of Need ("CON") from the Mississippi Division of Health Planning and Resource Development authorizing the relocation of the JMS Burn Center from Crossgates River Oaks Hospital to Jackson HMA/CMMC. As part of the general review (GR) criteria, GR criterian 10, applicant Jackson HMA/CMMC submitted the following affirmation:

> The applicant affirms that CMMC is a full service, general acute care hospital which participates in the Trauma System as a Level III trauma hospital. All support and ancillary services which may be needed by the Center [JMS Burn Center] will be available at CMMC.

Mississippi Division of Health Planning and Resource Development-CON review, relocation of burn center from Crossgates River Oaks Hospital to Central Mississippi Medical Center (August 2013).

47.    During the relevant time frame, CMMC-Merit obligated itself to participate in the Mississippi Trauma Care System as a Level III trauma hospital. [NOTE: cite Miss. Code Ann. § 41-59-5].

48.    As a Level III trauma hospital, CMMC-Merit was obligated by State law to have immediate 24 hour coverage for the following medical disciplines: emergency medicine, trauma surgery, general surgery, orthopaedic surgery, anesthesia, post anesthesia care unit, and intensive care unit. Level IV facilities are acute care facilities with a commitment to the resuscitation to

-13-

the trauma patient, with written transfer protocols in place to insure trauma patients are transferred to facilities able to provide a higher level of care.

49.     Distributions from MS trauma fund are made according to the Mississippi Trauma Care System Regulations.

50.     A participating Level IV Trauma Center is entitled to receive a $10,000 annual stipend, with the possibility of receiving an additional $10,000 in the form of an educational grant.

51.     The JMS Burn Center participates in the Mississippi trauma fund on the same basis as a Level I - III facility.

52.     After deduction of administrative expenses, and stipends disbursed to Level IV facilities, the remaining MS fund balance is distributed to EMS providers, Level I - III facilities, and the JMS Burn Center, as follows: 15% to EMS providers, and 85% to Level I - III trauma centers and the Burn Center.  The 85% is further allocated as follows: 1) 30% of the net balance to the trauma centers according to a fixed distribution method based upon their trauma designation, i.e., Level I, Level III, or Level III; 2) 50% of the net balance to the trauma centers according to a variable distribution method using patient data to compute an injury severity score, i.e., each trauma centers distribution is based on the number, type, and severity of trauma cases handled by the center; and, 3) the 5% remaining balance to the JMS Burn Center.

53.     Through repeated reports to CMMC administrative staff, Relator Dr. Vanderlan, provided substantial proof that CMMC-Merit was not in compliance with the Mississippi Trauma Care System as a Level III Trauma Center.

54.     By falsely and fraudulently hiding its non-compliance, and misrepresenting its level of participation CMMC-Merit was able to receive substantial distributions from the MS Trauma Fund (suspected to be in the millions of dollars) instead of being paid a Level IV stipend, in the thousands of dollars. By falsely and fraudulently hiding its non-compliance, and misrepresenting its level of participation CMMC-Merit avoided being assessed a non-participation fee/penalty for violating the Mississippi Trauma Care System Regulations.

## FACTS SUPPORTING RELATOR'S CLAIMS

55.     In October 2012, Relator Dr. Vanderlan was approached and asked to consider joining JMS Burn and Reconstruction Center. The JMS Burn Center was in the process of being moved from Crossgates Hospital in Brandon, Rankin County, Mississippi to CMMC in Jackson, Hinds County Mississippi because of the need for more capacity. Dr. Vanderlan was approached and asked to join JMS Burn Center and CMMC as an intensivist and burn/trauma/general surgeon.

56.     On April 1, 2013, Dr. Vanderlan joined The JMS Burn Center and the CMMC staff. On that date, Dr. Vanderlan entered into a Physician Recruitment Agreement with CMMC and The JMS Burn Center in which Dr. Vanderlan agreed to relocate his practice and provide physician services in exchange for certain financial benefits.

57.     Once on staff at CMMC, Dr. Vanderlan had and maintained full general surgical privileges, trauma surgical privileges, critical care privileges, emergency medicine privileges as well as privileges as an intensivist in the Burn ICU. Dr. Vanderlan also had and maintained coverage for these same privileges.

58.     Shortly after joining CMMC, Relator Dr. Vanderlan uncovered numerous ongoing and systematic compliance violations confirming that CMMC had engaged in a pattern of healthcare practice, mismanagement and fraud that systematically violated the conditions of participation and eligibility standards set forth above.

59.     As part of its systematic and ongoing activities, CMMC engaged in regular communications with federal and state government agents, intermediaries, and accrediting authorities on which the government relies in making Medicare and Medicaid eligibility determinations. CMMC's purpose was to create, portray and foster a false pretense of entitlement to participate in the Medicare and Medicaid programs.

60.     In late May/early June 2013, Relator Dr. Vanderlan met with members of the CMMC administrative staff and presented his concerns about multiple systematic EMTALA compliance violations. After the meeting, Dr. Vanderlan was asked to be Trauma Director at CMMC, over the objection of a member of the general surgery staff. CMMC next informed Dr. Vanderlan that the request would be for him to take the position, but he would not be allowed to take trauma call because CMMC-Merit unilaterally and in violation of hospital bylaws and standards caused Dr. Vanderlan's covering physician agreement to be withdrawn. In order to maintain surgical privileges, Dr. Vanderlan had to have a "covering physician" to treat his patients when he was unavailable.

61.     Dr. Vanderlan accepted the position while he worked to locate another "covering physician" and convince CMMC staff to allow him to take trauma call with other members of the CMMC staff. As Trauma Director, Dr. Vanderlan discovered and continued to report additional EMTALA violations to the same CMMC administrative staff.

-16-

62.     In July 2013, Dr. Vanderlan again met with CMMC staff about problems with the group assigned trauma/general surgery call adhering to trauma requirements of CMMC as a Level III trauma center.  At this meeting, Dr. Vanderlan specifically informed CMMC staff that patients were presenting to the CMMC emergency department and the on-call trauma/general surgeon would not take the call, and/or would order transfer of the patient under conditions that CMMC as a Level III trauma center were obligated to meet.

63.     After the July 2013 meeting, CMMC-Merit, in concert with other unnamed individuals/entities, worked to relieve Dr. Vanderlan of his call coverage arrangement with two other surgeons and removed Dr. Vanderlan and another cross-covering physician from the trauma and general surgery call schedule.  These acts were in direct violation of CMMC's protocols and bylaws.

64.     Due to a work related incident that required Dr. Vanderlan to remove himself from patient treatment (a scalpel stick injury), Dr. Vanderlan went on medical leave from CMMC and The JMS Burn Center from September 23, 2013 to October 21, 2013.

65.     On October 18, 2013, The JMS Burn Center forwarded an independent medical opinion to the Medical Executive Committee at CMMC supporting their request that Dr. Vanderlan's privileges be reinstated "to the status of his appointment prior to sick [medical] leave."  This would have included full general surgical privileges, trauma surgical privileges, critical care privileges, and emergency medicine privileges.

66.     CMMC bylaws prohibit the restriction, modification, limitation and/or suspension of hospital medical privileges unless certain specific protocols are followed.  However, members of the CMMC staff made it clear to Dr. Vanderlan that his insistence on reporting violations was

-17-

making it difficult for them to consider reinstatement to full privileges.

67.     With another covering physician in place, Dr. Vanderlan, supported by the CMMC by-laws, obtained full reinstatement of privileges.

68.     Although initially supporting full reinstatement, on November 11, 2013, a representative of The JMS Burn Center wrote CMMC asking that Dr. Vanderlan's privileges for general surgery, trauma surgery, critical care, and emergency medicine be withdrawn.  Such representative asked that Dr. Vanderlan's privileges be restricted to only those of an "intensivist in the BICU."  The next day (November 12, 2013), in violation of CMMC by-laws and the contractual agreements between the parties, CMMC withdrew Dr. Vanderlan's general surgery, trauma surgery, critical care, and emergency medicine privileges.

69.     During Dr. Vanderlan's medical leave of absence, the medical staff performance improvement committee at CMMC ("MSPI") initiated a review of a certain number of Relator Dr. Vanderlan's cases.  On December 20, 2013, the MSPI completed its review and issued its written decision that "no corrective action will be taken against [Dr. Vanderlan]."  CMMC staff used this finding of "no corrective action" with a promise of full privilege reinstatement to try again to convince Dr. Vanderlan to stop reporting violations of federal and state laws.

70.     By this time, Dr. Vanderlan had realized that further efforts to change the culture at CMMC would be futile.  As a result of the above combined acts of The JMS Burn Center and CMMC, and additional acts to be proved at trial, Dr. Vanderlan was forced to resign his clinical privileges at CMMC on December 20, 2013.

71.     CMMC-Merit's retaliatory efforts did not stop in December 2013.  Additional acts of retaliation will be proven at trial.

-18-

72.     The above described actions of CMMC were a response to and retaliation for Relator Dr. Vanderlan's reporting of EMTALA violations, and/or CMMC's violation of Medicare/Medicaid laws and regulations, as well as CMMC's violation of the Mississippi Department of Health Trauma Care System.  CMMC retaliated against Dr. Vanderlan while favoring certain other agents or contractors with financial interests contrary to those of Relator Dr. Vanderlan.

### Failure to Meet Emergency Needs of Patients as Required of a Level III Trauma Center and Repeated Systematic Violations of EMTALA

73.     As a member of the CMMC staff and head of trauma, Relator Dr. Vanderlan became aware of multiple instances of patients presenting to the CMMC Emergency Department and being denied the care required by a Level III trauma center and/or being transferred/dumped to a Level I facility in violation of EMTALA.  By way of specific illustration and without limitation, Relator Dr. Vanderlan offers the following:

### CASE 1
### Patient No. XXX627

74.     In January 2013, at 19:58, a 49 year old uninsured African American female presented to the CMMC Emergency Department (" CMMC ED") for treatment related to a motor vehicle accident.  The patient was a restrained driver who was struck on the left side of her vehicle.  The patient had a laceration of her left temple, a pneumothorax on the left that was "small", and had an unknown period of loss of consciousness.  Xrays revealed left sided rib fractures, minimally displaced.  There were at least four glass fragments seen on facial CT scan. There was no code Bravo called, despite the case meeting the requirements for Bravo.

75.     The CMMC on-call trauma/general surgeon was not consulted until 22:28. The on-call surgeon's instructions to the ED physician in charge was to observe the patient for 6 to 8 hours in the ED, repeat chest xray, and if no changes send the patient home.

76.     CMMC had available on staff a trauma surgeon as well as a cardiothoracic surgeon and pulmonologist. Although the on-call trauma surgeon was consulted for multi system trauma, the trauma surgeon failed to present and evaluate the patient. It was determined in the CMMC ED that the patient required trauma surgery admission. A CMMC trauma surgeon, CMMC cardiothoracic surgeon, and/or a CMMC pulmonologist were perfectly capable of taking this patient, evaluating this patient, and treating the patient at CMMC.

77.     CMMC staff were capable of taking care of the patient. The unstable patient was inappropriately transferred to UMMC.

## CASE 2
### *Patient No. XXX992*

78.     In May 2013, at 20:26, a 34 year old uninsured African American male presented to the CMMC ED with a gunshot wound to the left thigh. Code Alpha was called at 20:43. The patient had penetrating trauma to his left buttock, without a known intraperitoneal injury.

79.     According to applicable trauma code criteria for code Alpha, a trauma surgeon was required to arrive at CMMC ED to evaluate the patient within thirty minutes of patient arrival. The doctor in charge delayed both the Alpha call and the arrival of a trauma surgeon. The required medical screening evaluation of the patient was not sufficient to reveal that an emergency condition existed, i.e., the general surgeon on call did not take the patient to the operating room to evaluate the patient's condition.

-20-

80.     Upon arrival, the CMMC on-call trauma surgeon claimed that the injury was too complicated although an xray showed no fracture, and the bullet could be seen beneath the skin in the medial aspect of the patient's thigh.

81.     ·CMMC staff were capable of taking care of the patient.  The unstable patient was inappropriately transferred to UMMC.

## CASE 3
## _Patient No. XXX813_

82.     In March 2013, at 2:10, a 37 year old uninsured African American male presented to the CMMC ED at 2:10 after being struck in the head with a bottle.  The ED physician in charge identified concussion, ETOH positive, and cocaine positive with syncope.  Patient had signs of obvious skull fracture, no Battle's signs, no hemotypanum, no nasal drainage, and no raccoon eyes.  Code Bravo was called although Code Alpha criteria was met.

83.     There was no intracranial bleed or cervical trauma on CT imaging.  The patient required admission and monitoring for concussion.  The patient should have been admitted to CMMC and monitored for a concussion and hospitalized for any effect from substance and alcohol abuse.  The trauma surgeon on call failed to present and evaluate the patient.  The on-call surgeon claimed that the patient's neurotrauma required transfer to a Level I trauma center.

84.     Transfer was not required.  There was no benefit to transfer as a neurosurgeon was not needed.  Delay in the patient's treatment occurred because a transfer was unnecessary.  Monitoring should have continued at CMMC.

85.     CMMC staff were capable of taking care of the patient.  The unstable patient was inappropriately transferred to UMMC.

-21-

**CASE 4**
*Patient No. XXX931*

86.     On May 14, 2013, at 00:20, a 20 year old insured African American female presented to the CMMC ED with a gunshot wound to the neck, anterior entrance with posterior exit.  Code Alpha was called.  The trauma surgeon on call was contacted, called back, but did not respond to evaluate the patient.

87.     The patient had a large bulge on her left node.  Further evaluation and potential stabilization could have been performed by the on-call surgeon had he responded.  However, only a pressure dressing was applied.

88.     There was no ENT coverage.  The on-call surgeon, although not present to evaluate the patient, alleged that immediate transfer was necessary for a higher level of care with an ENT.  The on-call surgeon should have evaluated the patient to determine if admission at CMMC was required, and, if not, to ensure maximum stabilization prior to transfer.

89.     CMMC staff were capable of taking care of the patient.  The unstable patient was inappropriately transferred to UMMC.

**CASE 5**
*Patient No. XXX819*

90.     On May 21, 2013, a 22 year old uninsured African American male presented to the CMMC ED with a gunshot wound to the foot, with artery and nerve injury.  After medical screening, code Bravo was called.  Code Bravo was called although Alpha criteria was met.  On-call orthopaedics responded in less than thirty minutes.  The on-call trauma surgeon failed to present and evaluate the patient.

-22-

91.     The orthopaedic surgeon confirmed an extremely complex injury to the foot with artery, nerve and bone injuries, with numerous foreign bodies.  The orthopaedic surgeon determined that a specialized orthopaedic physician was required for this complex gun injury to the foot and advised transfer.

92.     CMMC staff were capable of taking care of the patient.  The unstable patient was inappropriately transferred to UMMC.

## CASE 6
### Patient No. XXX142

93.     On April 19, 2013 at 03:51, a 21 year old uninsured African American male presented to the CMMC ED with a gunshot wound to the abdomen.  Code Alpha was called. The on-call trauma surgeon responded.  A CT of the abdomen demonstrated a "small area of active hemorrhage with mild to moderate hemoperitoneum left upper quadrant."

94.     Although the trauma surgeon responded, he did not take the patient to surgery to stop the active bleeding and control contamination.   The trauma surgeon claimed that the OR crew could not be mobilized for an hour and a half.

95.     CMMC staff were capable of taking care of the patient.   The unstable patient was inappropriately transferred to UMMC.

## CASE 7
### Patient No. XXX125

96.     On February 1, 2013, at 19:40, a 21 year old insured African American male presented to the CMMC ED with a gunshot to the left inguinal region.  Code Bravo was called although Alpha criteria was met.  The on-call trauma surgeon was contacted.  The on-call trauma

surgeon refused to accept the patient stating that a higher level of care was required, and that all penetrating trauma must be sent directly to UMMC.

97.    CMMC staff were capable of taking care of the patient.  The unstable patient was inappropriately transferred to UMMC.

## CASE 8
### *Patient No. XXX656*

98.    On June 29, 2013, a 20 year old uninsured African American male presented to the CMMC ED with a gunshot wound causing a comminuted fracture of the right humerus. Code Alpha was called.  No orthopaedist was available.  The on-call trauma surgeon failed to present and evaluate the patient.

99.    CMMC staff were capable of taking care of the patient.   The unstable patient was inappropriately transferred to UMMC.

## CASE 9
### *Patient No. XXX265*

100.    On April 9, 2013, a 26 year old uninsured African American male presented to the CMMC ED with a gunshot wound to the abdomen.  The patient was unstable and required airway protection.  Code Alpha was called.  The on-call trauma surgeon was contacted but refused to present and evaluate the patient.  A surgeon was required to stop potential bleeding in the abdomen, explore for additional wounds, and stop contamination.

101.    CMMC staff were capable of taking care of the patient.   The unstable patient was inappropriately transferred to UMMC.

## CASE 10
### *Patient No. XXX271*

102.     On March 9, 2013, at 18:34, a 21 year old uninsured African American male presented to CMMC ED with gunshot wounds to his right thigh (a penetrating entrance and exit wound) and to the base of the shaft of his penis.  The patient was unable to ambulate.  Code Alpha was called.  The on-call trauma surgeon was contacted but refused to present and evaluate the patient.

103.     CMMC failed to provide an appropriate medical screening exam and stabilizing surgical intervention.  The physician in charge recommended transfer to UMMC claiming the patient's needs exceeded the capabilities of CMMC.

104.     CMMC staff were capable of taking care of the patient.  The unstable patient was inappropriately transferred to UMMC.

## CASE 11
### *Patient No. XXX194*

105.     On May 26, 2013 at 19:30, a 46 year old Medicare inpatient insured Caucasian female presented to the CMMC ED as a pedestrian struck by a motor vehicle.  The patient met the criteria for Code Alpha.  Code Alpha was not called.  Examination revealed that patient had a subarachnoid hemorrhage, pelvic fracture, and tibial plateau fracture.  Initial vitals were: B/P 122/82.  The patient's B/P dropped to 93/55.  There were two attempts to contact the on-call trauma surgeon.  The on-call trauma surgeon failed to present and evaluate the patient.  On-call neurosurgery coverage was not activated.  Orthopaedics was consulted and recommended transfer claiming CMMC did not have on-call neurosurgery.

-25-

106.    CMMC staff were capable of taking care of the patient.  The unstable patient was inappropriately transferred to UMMC.

### CASE 12
### _Patient No. XXX041_

107.    On May 16, 2013, at 21:45, a 45 year old uninsured Caucasian male presented to the CMMC ED with stab wounds to the neck and abdomen.  Code Alpha was called.  The on-call trauma surgeon responded by phone stating: "I'm on my way to help you stabilize the patient. All penetrating Alphas that are stable will be transferred to UMC.  Begin that process."  The on-call trauma surgeon did not arrive until 22:26, 36 minutes later.  Examination revealed a left neck laceration (6cm) and a left abdomen laceration (9cm).

108.    The initial medical screening was delayed as the on-call trauma surgeon arrived more than 30 minutes late.  There was no imaging performed of the neck and there was no surgical evaluation of the neck wound.  The on-call trauma surgeon advised transfer because the patient needed a higher level of care.  After transfer, the patient never required the operating room.  All repairs were performed in the UMMC ED by a trauma surgeon.

109.    CMMC staff were capable of taking care of the patient.  The unstable patient was inappropriately transferred to UMMC.

### CASE 13
### _Patient No. XXX239_

110.    On February 16, 2013, at 23:40, a 22 year old uninsured African American male presented to CMMC ED with an altered mental status and history of jumping out of a moving vehicle.  Code Bravo was called although Alpha criteria was met.  The patient was intubated. The on-call trauma surgeon failed to present and evaluate the patient.

-26-

111.    Upon further examination in the ED, the patient was determined to have a posterior skull fracture with edema.  There was no evidence that the trauma surgeon was contacted and informed of Alpha code criteria.  The patient required evaluation by a neurosurgeon.  On call neurosurgery coverage was not activated.

112.    CMMC staff were capable of taking care of the patient.  The unstable patient was inappropriately transferred to UMMC.

**CASE 14**
***Patient No. XXX014***

113.    On January 29, 2013, at 13:53, a 22 year old uninsured Hispanic male presented to the CMMC ED with a history of falling ten feet from a roof, complaining of left arm pain.  X-ray revealed a segmental fracture of the humerus.  The on-call orthopaedist was contacted to admit the patient.  The on-call orthopaedist refused to present and evaluate the patient.  There was no explanation as to why a higher level of care was required.  The on-call orthopaedist did not stabilize the patient.

114.    CMMC staff were capable of taking care of the patient.  The unstable patient was inappropriately transferred to UMMC.

**CASE 15**
***Patient No. XXX886***

115.    On October 24, 2013, at 12:23, a 15 year old Tricare/Medicaid insured African American male presented to the CMMC ED with a traumatic brain injury from a suicide attempt (gunshot).  Code Alpha was called.  The on-call trauma surgeon failed to present and evaluate the patient.  On-call neurosurgery was not activated.

-27-

116.    CMMC staff were capable of taking care of the patient.  The unstable patient was inappropriately transferred to UMMC.

## CAUSES OF ACTION

### COUNT ONE
### Knowingly Presenting or Causing to be presented False Claims
### [31 U.S.C. § 3729(a)(1)(A)]

117.    Relator Dr. Vanderlan incorporates by reference all allegations of this Supplemental Counterclaim and Third-Party Complaint.

118.    Through the acts described above, CMMC-Merit through their agents and employees knowingly presented and/or caused to be presented to the United States Government and/or the State of Mississippi false and fraudulent claims in order to obtain reimbursement for health care services provided under the subject health care reimbursement programs.

119.    The United States Government and/or the State of Mississippi was unaware of the falsity of the records, statements and claims made or submitted by Defendants CMMC-Merit, therefore, such claims were paid and continue to paid.

120.    As a direct and proximate result of Defendants CMMC-Merit's false claims and omissions, the United States Government and/or the State of Mississippi have been damaged in an amount to be proven at trial, equal to annual funds which would not have been paid from the subject health care reimbursement programs and/or the State of Mississippi Trauma Systems Fund.

121.    As a direct and proximate result of the acts and/or omissions of Defendants CMMC-Merit, Defendants are liable for treble damages, forfeitures, and other damages under the False Claims Act and other laws to be proven at trial.

## COUNT TWO
### Knowingly Making/Using a False Record Material to an Obligation to Pay
### [31 U.S.C. § 3729(a)(1)(B) and (a)(1)G)]

122.    Relator Dr. Vanderlan incorporates by reference all allegations of this

Supplemental Counterclaim and Third-Party Complaint.

123.    Through the acts described above, Defendants CMMC-Merit and their agents and

employees have knowingly made, used, and/or caused to be made or used, false records or

statements material to a false or fraudulent claim and/or material to an obligation to pay or

transmit money or property from the United States Government and/or the State of Mississippi to

Defendants CMMC-Merit.  Defendants CMMC-Merit have also failed to disclose to the United

States Government and/or the State of Mississippi material facts that would have resulted in

substantial repayment of fines, penalties, program fees, etc., both to the United States

Government and the State of Mississippi, including, but not limited to the following:

    a)    Fines and civil penalties for each bill and/or request for payment fraudulently
        submitted under the False Claims Act.  28 C.F.R. § 85.3(a)(9).

    b)    Fines and civil penalties for each violation of EMTALA.  42 U.S.C. §
        1395dd(d)(1)(A).

    c)    Fines and civil penalties and program fees for falsely certifying compliance as a
        Level III Trauma Center pursuant to the Mississippi Trauma Systems Fund.

    d)    Additional fines, penalties, program fees, etc., owed will be proven at trial.

124.    As a direct and proximate result of the acts and omissions by Defendants

CMMC-Merit Health, Defendants have avoided payment of civil fines and penalties, and have

been paid program fees for which Defendants were not entitled.  Therefore, the United States

Government and the State of Mississippi have not recovered funds that otherwise would have

been recovered, and/or paid program fees that would not otherwise have been paid.

125.    As a direct and proximate result of Defendants CMMC-Merit's false claims and omissions, the United States Government and/or the State of Mississippi have been damaged in an amount to be proven at trial, equal to fines and penalties owed and program fees wrongfully paid from the subject health care reimbursement programs and/or the Mississippi Trauma Care System Fund.

126.    As a direct and proximate result of the acts and/or omissions of Defendants CMMC-Merit, Defendants are liable for treble damages, forfeitures, and other damages under the False Claims Act and other laws to be proven at trial.

**COUNT THREE**
**Retaliatory Discharge/Harassment**
**[31 U.S.C. § 3730(h)]**

127.    Relator Dr. Vanderlan incorporates by reference all allegations of this Supplemental Counterclaim and Third-Party Complaint.

128.    As a direct response to Relator Dr. Vanderlan's investigation and reporting of errors, omissions, shortcomings, and fraudulent activities as stated above, CMMC-Merit engaged in a threatening campaign of harassment and intimidation directed at Dr. Vanderlan and designed to discourage and prevent him from investigating and asserting these claims.

129.    This campaign of harassment and intimidation resulted in Dr. Vanderlan being forced to resign from the CMMC medical staff.

130.    As a direct and proximate cause of the actions by Defendants CMMC-Merit, Dr. Vanderlan was effectively discharged, demoted, suspended, threatened, harassed, or in other manners discriminated against in the terms and conditions of his employment.  Therefore,

Dr. Vanderlan is entitled to all relief under the False Claims Act Retaliatory Harassment and

Discharge Provisions.  31 U.S.C. § 3730(h).

## COUNT FOUR
### Conspiracy to Violate the False Claims Act
### [31 U.S.C. § 3729(a)(1)(C)

131.    Relator Dr. Vanderlan incorporates by reference all allegations of this

Supplemental Counterclaim and Third-Party Complaint.

132.    Defendants CMMC and Merit conspired to get false and fraudulent claims paid by

the United States Government and the State of Mississippi and/or otherwise conspired to commit

the substantive violations described in greater detail above. In furtherance of this conspiracy,

Defendants CMMC and Merit performed the various acts pled above.

## COUNT FIVE
### Implied False Certification

133.    Relator Dr. Vanderlan incorporates by reference all allegations of this

Supplemental Counterclaim and Third-Party Complaint.

134.    Submissions made by Defendants CMMC and Merit to the United States

government for payment during the time described impliedly certified CMMC and Merit's

continued adherence to regulations that were a precondition to payment under the reimbursement

programs described.  Specifically, for each submission, CMMC and/or Merit falsely certified

compliance with EMTALA, 42 U.S.C. § 1395cc(A)(1)(I)(i), requiring hospitals with emergency

departments such as CMMC to provide a medical screening to anyone who enters an emergency

room and requests an examination for a medical condition, without regard to the patient's ability

to pay, i.e. by engaging in a systematic practice of patient dumping.

135.   In addition to the above, CMMC and Merit falsely certified compliance with the requirements of the State of Mississippi Trauma Systems Fund, specifically their adherence to the requirements of a trauma center commensurate with their capabilities.

136.   CMMC and Merit's knowingly false certifications caused to be made or were used to submit false or fraudulent claims to the United States Government and the State of Mississippi and/or caused to be made or were used to create false records and/or statements material to an obligation to pay or transmit money or property by the United States Government and/or the State of Mississippi to Defendants CMMC-Merit. 31 U.S.C. § 3729(a)(1)(B) and (a)(1)(G).

137.   As a direct and proximate result of the false certifications of Defendants CMMC-Merit, Defendants are liable for treble damages, forfeitures, and other damages under the False Claims Act and other laws to be proven at trial.

**COUNT SIX**
**Worthless Services**

138.   Relator Dr. Vanderlan incorporates by reference all allegations of this Supplemental Counterclaim and Third-Party Complaint.

139.   CMMC-Merit intentionally and knowingly provided sub-standard and deficient services to the United States government and/or the State of Mississippi, upon information and belief, by providing and charging for inadequate medical screening through its emergency department for tests and procedures that had to be repeated after patients were inappropriately transferred to UMMC.

140.   As a direct and proximate result of the worthless services provided by Defendants CMMC-Merit, Defendants are liable for treble damages, forfeitures, and other damages under the

False Claims Act and other laws to be proven at trial.

WHEREFORE, PREMISES CONSIDERED, Relator W. Blake Vanderlan, M.D., respectfully requests that this Court enter final judgment against Jackson HMA, LLC d/b/a Central Mississippi Medical Center and Merit Health Central-Jackson successor in interest to Jackson HMA, LLC d/b/a Central Mississippi Medical Center, as follows:

A.   Entry of a judgment in favor of the United States of America against Defendants CMMC and Merit, jointly and severally, for three times the amount of damages the United States has sustained as a result of the actions of Defendants, as well as a civil penalty equaling $10,000 for each violation of 31 U.S.C. § 3729;

B.   Entry of a judgment in favor of the State of Mississippi against Defendants CMMC and Merit, jointly and severally, for three times the amount of damages the State of Mississippi has sustained as a result of the actions of Defendants, as well as a civil penalty equaling $10,000 for each violation of 31 U.S.C. § 3729;

C.   Entry of a judgment awarding Relator Dr. Vanderlan the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the False Claims Act;

D.   That Relator Dr. Vanderlan be awarded double the individual damages he sustained as a result of Defendants' CMMC and Merit's retaliatory discharge/harassment;

E.   That the Court enter judgment in favor of Relator Dr. Vanderlan for all costs, expenses, pre-judgment interest, post-judgment interest, attorneys' fees, and all such additional damages to which Relator Dr. Vanderlan would be entitled by law; and

F.     That the Court enter judgment in favor of the United States of America and the

State of Mississippi for all such damages and other/further relief as the Court

deems appropriate.

This the 23RD day of October, 2015.

Respectfully submitted,

W. BLAKE VANDERLAN, M.D. by:

/s/ C. Victor Welsh, III *By: Kathy Parson*
C. VICTOR WELSH, III   *by Permission*

/s/ Lance L. Stevens
LANCE L. STEVENS

OF COUNSEL:

C. VICTOR WELSH, III (MSB# 7107)
cvw@pgrwlaw.com
PITTMAN, GERMANY, ROBERTS & WELSH, L.L.P.
POST OFFICE BOX 22985
JACKSON, MS 39225-2985
(601) 948-6200 - PHONE
(601) 948-6187 - FAX

         AND

LANCE L. STEVENS (MSB # 7877)
lstevens@stevensandward.com
RODERICK D. WARD, III (MSB # 6953)
rward@stevensandward.com
1855 LAKELAND DRIVE, STE. Q-200
JACKSON, MS 39216
(601) 366-7777 - PHONE
(601) 366-7781- FAX

ATTORNEYS FOR W. BLAKE VANDERLAN, M.D.