# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### NORTHERN DIVISION

THE UNITED STATES OF AMERICA, and
THE STATE OF MISSISSIPPI
*ex rel,* W. BLAKE VANDERLAN, M.D.                                    **PLAINTIFFS**

**V.**                                                    **CAUSE NO. 3:15-cv-767-DPJ-FKB**

JACKSON HMA, LLC d/b/a
Central Mississippi Medical Center;                              **DEFENDANT**
          a/k/a
MERIT HEALTH CENTRAL - JACKSON

--------------------------------------------------------------------------------

## RELATOR'S RESPONSE IN OPPOSITION TO
## JACKSON HMA'S MOTION TO DISMISS FIRST AMENDED COMPLAINT

--------------------------------------------------------------------------------

C. VICTOR WELSH, III (MSB# 7107)
cvw@pgrwlaw.com
PITTMAN, GERMANY, ROBERTS & WELSH, L.L.P.
POST OFFICE BOX 22985
JACKSON, MS 39225-2985
(601) 948-6200 - PHONE
(601) 948-6187 - FAX

    AND

LANCE L. STEVENS (MSB # 7877)
lstevens@stevensandward.com
RODERICK D. WARD, III (MSB # 6953)
rward@stevensandward.com
1855 LAKELAND DRIVE, STE. Q-200
JACKSON, MS 39216
(601) 366-7777 - PHONE
(601) 366-7781- FAX

ATTORNEYS FOR RELATOR

**TABLE OF CONTENTS**

TABLE OF CONTENTS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I.      STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     FEDERAL AND STATE REGULATIONS AT ISSUE. . . . . . . . . . . . . . . . . . . . . . . . . . 3

        A.      The FCA.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        B.      Medicare, Medicaid, EMTALA and the FCA. . . . . . . . . . . . . . . . . . . . . . . . . . 5

        C.      The Mississippi Trauma Care System. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

III.    ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        A.      The FCA public disclosure bar is no defense.  . . . . . . . . . . . . . . . . . . . . . . . 11

        B.      Relator Vanderlan has pled "express false certification"
                with the required specificity.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        C.      Relator Vanderlan has pled "implied false certification"
                with the requirement specificity.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

                        Representations about Services. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        D.      Jackson HMA's false certifications were material to the
                Government's payment position. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

        E.      If a violation of general Medicare regulations can form the
                basis of an FCA case, additional specific violations of EMTALA
                should form an even stronger case.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

        F.      Relator Vanderlan has pled a reverse FCA claim with the
                required specificity.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

        G.      Relator Vanderlan has pled a claim for retaliatory discharge.. . . . . . . . . . . . . 33

        H.      Relator Vanderlan has pled a claim for injunctive relief. . . . . . . . . . . . . . . . . 34

IV.     CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

## <u>TABLE OF AUTHORITIES</u>

### <u>CASES</u>

1.  *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

2.  *Avco Corp. v. U.S. States Dep't of Justice*, 884 F.2d 621
    (D.C. Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

3.  *Baker County Medical Services, Inc. v. U.S. Atty. Gen.*,
    763 F.3d 1274 (11ᵗʰ Cir. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 16

4.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

5.  *Burditt  v. United States Dept. of Health & Human Servs.*,
    934 F.2d 1362 (5th Cir.1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

6.  *Colony Ins. Co. v. D & S Enterprises of Natchez*,
    11-cv-53-DPJ-FKB, 2011 WL 5138640 (S.D.Miss. Oct. 27, 2011). . . . . . . . . . . . . . . 12

7.  *Deron v. Wilkins,* 879 F.Supp. 603 (S.D. Miss. 1995).. . . . . . . . . . . . . . . . . . . . . . . . 6, 24

8.  *Graham County Soil and Water Conservation Dist. v.
    U.S. ex rel. Wilson*, 559 U.S. 280 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

9.  *Harold H. Huggins Realty, Inc. v. FNC, Inc.*,
    634 F.3d 787 (5ᵗʰ Cir. 2011).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

10. *Harper v. Mississippi Dept. of Human Services*,
    2013 WL 1624580, (S.D.Miss. Apr. 15, 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

11. *Jamison v. McKesson Corporation*,
    649 F.3rd 322 (5ᵗʰ Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

12. *Jones v. Greninger,* 188 F.3d 322 (5th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

13. *Martin K. Eby Constr. Co. v. Dall. Area Rapid Transit*,
    369 F.3d 464 (5th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

14. *State Farm Fire and Cas. Co. v. U.S. ex rel. Rigsby*,
    137 S.Ct. 436 (2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

15. *Taylor v. Nissan North America,* No. 16-cv-821 DPJ-FKB,
   2017 WL 2727276 (S.D.Miss. June 23, 2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

16. *Thomas v. ITT Educational Services, Inc.,*
   517 Fed.Appx. 259 (5th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

17. *U.S. v. Bollinger Shipyards, Inc.,* 775 F.3d 255 (5th Cir. 2014). . . . . . . . . . . . . . . . . . . . 11

18. *U.S. ex rel. Bain v. Georgia Gulf Corp.,*
   386 F.3d 648 (5th Cir. 2004).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31, 32

19. *U.S. ex rel. Connor v. Salina Regional Health Center, Inc.,*
   543 F.3d 1211 (10th Cir. 2008).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

20. *U.S. ex rel. Dick v. Long Island Lighting Co.,*
   912 F.2d 13 (2nd Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

21. *U.S. ex rel. Doe v. Lincare Holdings, Inc.,* No. 15-cv-19-DCB-MTP,
   2017 WL 752288 (S.D. Miss. Feb. 27, 2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

22. *U.S. ex rel. Garibaldi v. Orleans Parish School Board,*
   21 F.Supp.2nd 607 (E.D.La. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

23. *U.S. ex rel. Longhi v. U.S.,* 575 F.3d 458 (5th Cir. 2009).. . . . . . . . . . . . . . . . . . . 18, 22, 23

24. *U.S. ex rel. Marcy v. Rowan Companies, Inc.,*
   520 F. 3d 384 (5th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 29, 30, 31, 32

25. *U.S. ex rel. Simoneaux v. E.I. duPont de Nemorus and Co.,*
   843 F.3d 1033 (5th Cir. 2016).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30, 31, 32

26. *U.S. ex rel. Wall v. Vista Hospice Care, Inc.,*
   778 F.Supp.2d 709 (N.D.Tex.2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

27. *U.S. ex rel. Wilkins v. United Health Group, Inc.,*
   659 F.3d 295 (3d Cir. 2011).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15, 17, 24, 31

28. *Universal Health Services, Inc. v. U.S. ex rel. Escobar,*
   136 S.Ct. 1989 (2016). . . . . . . . . . . . . 4, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 26, 27, 28

29. *Waldmann v. Fulp,* No. 13-cv-495, 2016
   WL 9711525 (S.D.Tex. Oct. 13, 2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28, 29

-iv-

## OTHER AUTHORITIES

31 U.S.C. § 3729. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 13, 15, 23, 29, 31

31 U.S.C. § 3730. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 11

42 U.S.C. § 1395. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

42 U.S.C. § 1395cc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 16, 24

42 U.S.C. § 1395dd. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 6, 21, 22, 32

42 U.S.C. § 1396. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

28 C.F.R. § 85.3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

42 C.F.R. § 430.0. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

42 C.F.R. § 489.20. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 24, 25

42 C.F.R. § 489.24. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 14, 17, 21, 22, 24, 25

42 C.F.R. § 489.53. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

Fed.R.Civ.P. 8. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Fed.R.Civ.P. 9. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 11

Fed.R.Civ.P. 12. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 12

Fed.R.Civ.P. 56. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Joint Legislative Committee on Evaluation and Expenditure Review
(PEER), *Report the Mississippi Legislature* (January 3, 2013). . . . . . . . . . . . . . . . . . . . . 8

Keeton, Dobbs, Keeton, & Owen, *Prosser and Keeton*
*on Law of Torts* § 106, p. 738 (5th Ed. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Restatement (Second) of Contracts § 161 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Restatement (Second) of Contracts § 162. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Restatement (Second) of Torts § 529 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Restatement (Second) of Torts § 538.........................................23

The Fraud Enforcement and Recovery Act of 2009 ("FERA")......................31

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

**THE UNITED STATES OF AMERICA, and**
**THE STATE OF MISSISSIPPI**
*ex rel,* **W. BLAKE VANDERLAN, M.D.**                                          **PLAINTIFFS**

**V.**                                                         **CAUSE NO. 3:15-cv-767-DPJ-FKB**

**JACKSON HMA, LLC d/b/a**
**Central Mississippi Medical Center;**                              **DEFENDANT**
                 **a/k/a**
**MERIT HEALTH CENTRAL - JACKSON**

---

**RELATOR VANDERLAN'S RESPONSE IN OPPOSITION TO JACKSON HMA'S**
**MOTION TO DISMISS FIRST AMENDED COMPLAINT**

---

COMES NOW, Plaintiff/Relator, W. Blake Vanderlan, M.D. ("Relator Vanderlan") and files

this Response in Opposition to Jackson HMA's Motion to Dismiss First Amended Complaint, as

follows:

## I. STATEMENT OF THE CASE[1]

In April 2013, Relator Vanderlan joined Merit Health Central [2] with full general surgical

privileges, critical care privileges and emergency medical privileges.  Relator Vanderlan was later

assigned the position of Trauma Director. FAC ¶ 18.  While on staff, Relator Vanderlan confirmed

that the emergency department was engaging in a systematic pattern of healthcare fraud whereby

African American patients with no insurance coverage would be transferred to a public hospital,

---

[1] References to Relator Vanderlan's First Amended Complaint will be by paragraph and
identified by the citation form: "FAC ¶ __."

[2] In his operative First Amended Complaint, Relator Vanderlan refers to Jackson HMA's hospital
as "CMMC."  Jackson HMA refers to its hospital as "Merit Health Central."  Going forward, Relator
Vanderlan will refer to Jackson HMA's hospital as Merit Health Central.

UMMC, in violation of EMTALA.[3]   FAC ¶¶ 55-57.   After repeatedly informing the hospital administrative staff, Relator Vanderlan was forced to resign his position upon realizing that his efforts to change the culture in the emergency department would be futile. FAC ¶¶ 59-69.

In January 2014, Relator Vanderlan began providing Merit Health Central emergency department patient files, documents and records, along with interviews, to investigators at the Office of the Inspector General ("OIG") and the Department of Health and Human Services ("HHS").  FAC ¶ 20.  In February 2014, Relator Vanderlan was the unnamed source for a news article entitled: *Trauma Transfer Could Put Lives at Risk*, Jackson Clarion Ledger (Feb. 22, 2014).  The Clarion Ledger Article contained references to the same treatment information and patient records that Relator Vanderlan had turned over to the Government.  No patients were mentioned by name.[4]

Jackson HMA correctly suspected that Relator Vanderlan was the source of the Clarion Ledger Article.  Therefore, just over two months after the Clarion Ledger Article appeared, Jackson HMA retaliated by filing a preemptive lawsuit in Madison County State Court for breach of contract. An additional preemptive retaliatory act by Jackson HMA will be disclosed to the Court for its *in camera* consideration.

In May 2015, based solely on the investigation authorized in response to information

---

[3] The Emergency Medical Treatment and Labor Act ("EMTALA") was enacted by Congress in 1986 as part of the Consolidated Omnibus Budget Reconciliation Act ("COBRA").  42 U.S.C. § 1395dd. Referred to as the "Anti-Dumping Law," EMTALA was designed to prevent hospitals from transferring uninsured patients to public hospitals without, at a minimum, providing a medical screening examination to ensure that the patients were stable.

[4] Jackson HMA's public disclosure bar defense is based on the Clarion Ledger Article.  As discussed *infra*, Relator Vanderlan did not obtain information from the press and then turn the same information over to the Government.  Therefore, Jackson HMA's public disclosure bar defense is without merit.

provided by Relator Vanderlan, CMS notified Merit Health Hospital of violations of EMTALA and "deficiencies...so serious that they constitute an immediate threat and jeopardy to the health and welfare of any individual who comes to [Merit Health Hospital] with an emergency medical condition."[5] FAC ¶ 5.

The following day, May 14, 2015, CMS wrote Relator Vanderlan confirming that its investigation, authorized in response to information he provided, had resulted in confirmation that Defendants had violated EMTALA.[6]  CMS advised Relator Vanderlan that he should "consider the civil enforcement provisions of [EMTALA] on an independent basis."[7]  FAC ¶ 6.  This *qui tam* FCA case is Relator Vanderlan's response to CMS's written directive.

## II.  FEDERAL AND STATE REGULATIONS AT ISSUE

### A.    The FCA

The False Claims Act "(FCA"), 31 U.S.C. § 3729 *et. seq.*, is the Government's primary litigation tool for recovering losses sustained as a result of fraud.  *U.S. ex rel. Marcy v. Rowan Companies, Inc.*, 520 F. 3d 384, 388 (5th Cir. 2008), citing *Avco Corp. v. U.S. States Dep't of Justice*, 884 F.2d 621, 622 (D.C.Cir.1989).  The FCA prohibits the submission of false or fraudulent claims and the making of false statements for the purpose of causing a claim to be paid.  In addition, the FCA prohibits a variety of deceptive practices involving the payment of government funds and property. 31 U.S.C. § 3729(a)(1)(A) - (G).  Entities that violate the FCA are liable for civil penalties,

---

[5] CMS Determination Letter - Doc. #50-1, at p. 1.  Merit Health was also notified that June 5, 2015 was its termination date from the Medicare program.  *Id*. at p. 2.

[6] CMS Letter to Vanderlan - Doc. #50-2, at p. 1.  Relator Vanderlan was also provided with a copy of the CMS Determination Letter.  *Id.*

[7] *Id.*

three times the government's damages, i.e. program payments, and all costs of any civil action. 31 U.S.C. § 3729(a)(1)(G) & (a)(3); 28 C.F.R. § 85.3(a)(9) .

Under the *qui tam* provisions of the FCA, a private individual known as a "relator" may bring a civil action in the name of the United States to enforce provisions of the FCA and is entitled to share a percentage of any recovery resulting from the suit.  31 U.S.C. § 3730(b) & (d).  *See also, State Farm Fire and Cas. Co. v. U.S. ex rel. Rigsby,* 137 S.Ct. 436, 440 (2016) (*qui tam* enforcement provisions of FCA allow a private party known as a "relator" to bring an FCA action on behalf of the Government).  It has been stated that "[t]he purpose of the *qui tam* provisions of False Claims Act is to encourage private individuals who are aware of fraud being perpetrated against the Government to bring such information forward."  *U.S. ex rel. Dick v. Long Island Lighting Co.*, 912 F.2d 13, 18 (2nd Cir. 1990) (quoting testimony before Senate Judiciary Committee's Subcommittee on Administrative Practice and Procedure stating that the amended FCA rewards those who "bring . . . wrongdoing to light.").

"This system is designed to benefit **both** the relator and the Government. A relator who initiates a meritorious *qui tam* suit receives a percentage of the ultimate damages award, plus attorney's fees and costs. (citation omitted).  In turn, 'encourag[ing] more private enforcement suits serves to strengthen the Government's hand in fighting false claims.' " (emphasis added).  *U.S. ex rel. Rigsby,* 137 S.Ct. at 440, quoting *Graham County Soil and Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 298 (2010).  Congress has amended the FCA over the years and has increased the FCA's civil penalties so that liability is "essentially punitive in nature."  *Universal Health Services, Inc. v. U.S. ex rel. Escobar*, 136 S.Ct. 1989, 1996 (2016) (additional citations omitted).

-4-

**B.      Medicare, Medicaid, EMTALA and the FCA**

The Department of Health and Human Services ("HHS"), through the Center for Medicaid and Medicare Services ("CMS"), funds and administers the Medicare program, which is a system of healthcare insurance for the aged and disabled created under Title XVIII of the Social Security Act, 42 U.S.C. § 1395, *et. seq.*.  In 1965, pursuant to Title XIX of *The Social Security Act*, 42 U.S.C. § 1396 et seq., Medicaid was established as a joint federal and state program to provide financial assistance for medical care to individuals with low incomes.  Through CMS, HHS provides federal funds to the State of Mississippi's Medicaid program.  Therefore, Medicaid is funded in part from federal funds and in part from state funds.  42 U.S.C. §§ 1396, *et. seq*. FAC ¶¶ 22-23.

Under Medicaid, each state establishes its own eligibility standards, benefit packages, payment rates and program administration in accordance with certain federal statutory and regulatory requirements. The state pays the health care providers for services rendered to Medicaid recipients, with the state obtaining the federal share of the Medicaid payment from accounts that draw on the United States Treasury.  42 C.F.R. §§ 430.0, et seq..  Therefore, the FCA reaches all false claims submitted to State administered Medicaid programs. FAC ¶ 24.

In order to receive payments under the Medicare program, a hospital must meet the requirements of the Medicare Act, 42 U.S.C. § 1395, *et seq*., as well as the regulations established by the Secretary of Health and Human Services.[8]  When informing Relator Vanderlan of its Determination Letter, CMS noted that Merit Health Central had violated the emergency care obligations of EMTALA, identified as "[s]pecial responsibilities of Medicare hospitals in emergency

---

[8] CMS identified these requirements as part of its CMS Determination Letter.  Doc. #50-1, at p. 1.

cases."[9]  Hospitals which execute Medicare provider agreements with the Federal Government are required to treat all persons who enter their emergency departments in accordance with  EMTALA. *Deron v. Wilkins,* 879 F.Supp. 603, 607 (S.D.Miss.1995), citing 42 U.S.C. § 1395cc; and, *Burditt v. U.S. Dept. of Health & Human Servs*., 934 F.2d 1362, 1366 (5th Cir.1991). Compliance with the requirements of EMTALA [Section 1395dd] is a condition for participation **and** payment under the Medicare reimbursement program.  *Baker County Medical Services, Inc. v. U.S. Atty. Gen.*, 763 F.3d 1274, 1277 (11th Cir. 2014), citing 42 U.S.C. § 1395cc(a)(1)(I)(i).

EMTALA requires Medicare participating hospital emergency staffs to provide a medical screening to anyone who "comes to the emergency department" and requests an examination for a medical condition.  42 U.S.C. § 1395dd(a); 42 C.F.R. § 489.24 (a)(1)(i).[10]  If an emergency medical condition is diagnosed, the participating hospital must provide the necessary stabilizing treatment consistent with such hospital's capabilities or, where appropriate, transfer the individual to another medical facility. 42 U.S.C. § 1395dd(b)(1)(A)-(B); 42 C.F.R. § 489.24(a)(1)(ii).[11]  Participating hospitals are required to treat the emergency medical conditions of patients in a non-discriminatory manner, regardless of their ability to pay or insurance status.  42 U.S.C. § 1395dd(h); 42 C.F.R. § 489.24(d)(4).

In order to receive payments under the Medicare reimbursement program, participating hospitals such as Merit Health Central are obligated to file agreements and certifications with the

---

[9] CMS Letter to Vanderlan - Doc. #50-2, at p. 1.

[10] 42 C.F.R. § 489.24 is the codification of EMTALA rules, regulations, and requirements established by the Secretary of HHS that apply to Medicare participating hospitals.

[11]  The individual cannot be transferred prior to stabilization.  42 U.S.C. § 1395dd(c)(1).

Secretary of HHS.  FAC ¶29.  In the case of a critical access hospital such as Merit Health Central, as a condition for payment, Merit Health Central must adopt and enforce a policy to ensure compliance with the requirements of EMTALA, meet the requirements of EMTALA, and expressly certify compliance with EMTALA.  FAC ¶30.  42 U.S.C. § 1395cc (a)(1)(I)(i); 42 C.F.R.§ 489.24(e)(1)(ii)(B), (C).  (If transfer occurs, a physician or qualified medical person must certify that the transfer conditions of EMTALA has been met, and "the certification must contain a summary of the risks and benefits of the transfer").  The specific certification regulation identified is contained in the Section: *Special Responsibilities of Medicare Hospitals in Emergency Cases*.  42 C.F.R. § 489.24.

In the case of Jackson HMA, CMS confirmed that Merit Health Central had violated these same certification regulations and other emergency care obligations of EMTALA when CMS wrote: "The complaints alleged noncompliance with the requirements of 42 C.F.R. 489.24 *Responsibilities of Medicare Participating Hospitals in Emergency Cases* and/or the related requirements of 42 C.F.R. 489.20."[12]  FAC ¶5.  After referencing specific failures at Merit Health Central including failure to provide stabilizing treatment, adequate medical screening, and appropriate transfers, CMS stated its finding: "We [CMS] have determined that your hospital violated the requirements of 42 C.F.R. 489.24 and/or 42 C.F.R. 489.20 and that an Immediate Jeopardy exists..."[13]  *Id.*

Jackson HMA is incorrect  to suggest or imply that Relator Vanderlan has failed to plead false certifications by Merit Health Central's staff.  Not only has Relator Vanderlan pled the regulatory basis for such false certifications, he has also submitted undisputed proof that the false

---

[12] CMS Determination Letter - Doc. #50-1, at p. 1.

[13] *Id.*

certifications formed the basis of corrective action taken by CMS.

**C.    The Mississippi Trauma Care System**

As a Medicare participating hospital, Merit Health Central was obligated pursuant to EMTALA to treat patients presenting to its emergency department consistent with the hospital's capacity and the capabilities of its staff.  Jackson HMA wrongfully concludes that Relator Vanderlan's reference to the Mississippi Trauma Care System is a basis for claims asserted to recover state trauma fund payments wrongfully made and/or state trauma fund fines wrongfully avoided.[14] There are no causes of action asserted in Relator Vanderlan's operative First Amended Complaint for recovery of State Trauma System Funds.  However, in order to meet the pleading requirements of Fed.R.Civ.P. 9, Relator Vanderlan included in his First Amended Complaint an overview of the Mississippi Trauma Care System to define the capacity and capabilities of Merit Health Central staff pursuant to EMTALA.

The Mississippi Legislature created the State Trauma Care System to "reduce the death and disability from traumatic injury."  Mississippi law requires every Mississippi licensed acute care facility to participate in the statewide Trauma Care System.  Facilities are designated as Levels I-IV trauma centers based on specific criteria, including the services each facility offers.  Any hospital that chooses not to participate in the Trauma Care System or that participates at level lower than the level at which it is capable of participating, as determined by the Mississippi Department of Health, must pay non-participation fee.  Joint Legislative Committee on Evaluation and Expenditure Review (PEER), *Report the Mississippi Legislature* (January 3, 2013).  FAC ¶ 41.

In August 2013, Jackson HMA requested a Certificate of Need ("CON") from the Mississippi

_____

[14] *See,* Memorandum in Support of Motion to Dismiss: Doc. # 52, at pp. 17-18.

Division of Health Planning and Resource Development authorizing the relocation of the JMS Burn

Center from Crossgates River Oaks Hospital to Jackson HMA/Merit Health Central.  As part of the

general review (GR) criteria, GR criterion 10, applicant Jackson HMA submitted the following

affirmation:

> The applicant affirms that Merit Health Central is a full service,
> general acute care hospital which participates in the Trauma System
> as a Level III trauma hospital.  All support and ancillary services
> which may be needed by the Center [JMS Burn Center] will be
> available at Merit Health Central.

Mississippi Division of Health Planning and Resource Development-CON review, relocation of burn

center from Crossgates River Oaks Hospital to Central Mississippi Medical Center (August 2013).

During the relevant time frame, Jackson HMA obligated itself to participate in the Mississippi

Trauma Care System as a Level III Trauma Center, and held itself out to the public as a Level III

Trauma Center with the requisite capacity and capabilities.  FAC ¶ 44.

As a Level III trauma hospital, Jackson HMA was obligated by State law to have immediate

24 hour coverage for the following medical disciplines: emergency medicine, trauma surgery, general

surgery, orthopaedic surgery, anesthesia, post anesthesia care unit, and intensive care unit.  A Level

II trauma hospital would have each of the above disciplines along with neurosurgery coverage.[15]

FAC ¶ 46.

As pled in the operative First Amended Complaint, during the time frame at issue, Merit

Health Central had neurosurgery coverage.  Therefore, for purpose of this Motion, Merit Health

Central staff had the ability and were required to treat trauma patients commensurate with the

---

[15] Mississippi Trauma Care System Regulations Rule 1.3.12.  Many violations identified at Merit Health Central relate to the failure of a white on-call trauma surgeon to present and provide the required EMTALA medical screening and/or stabilization for uninsured African American patients.  FAC ¶116.

capacity and capabilities of a Level II trauma hospital.  *Id.*

### III.  ARGUMENT

When considering a motion under Rule 12(b)(6), the "court accepts 'all well-pleaded facts

as true, viewing them in the light most favorable to the plaintiff.' " *Taylor v. Nissan North America,*

No. 16-cv-821 DPJ-FKB, 2017 WL 2727276, at *1 (S.D.Miss. June 23, 2017), citing *Martin K. Eby*

*Constr. Co. v. Dall. Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004) (quoting *Jones v.*

*Greninger,* 188 F.3d 322, 324 (5th Cir. 1999) (per curiam)). But "the tenet that a court must accept

as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare

recitals of the elements of a cause of action, supported by mere conclusory statements, do not

suffice." *Taylor v. Nissan,* 2017 WL 2727276, at *1, quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). To overcome a Rule 12(b)(6)

motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."

*Taylor v. Nissan,* 2017 WL 2727276, at * 1 (quoting *Twombly*, 550 U.S. at 570.)  "A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (quoting

*Twombly*, 550 U.S. at 556).

"Since *Iqbal*, the Fifth Circuit has stated that the Supreme Court's 'emphasis on plausibility

of a complaint's allegations does not give district courts license to look behind those allegations and

independently assess the likelihood that the plaintiff will be able to prove them at trial.'" *Harper*

*v. Mississippi Dept. of Human Services,* 2013 WL 1624580, * 2 (S.D.Miss. Apr. 15, 2013) (quoting

*Harold H. Huggins Realty, Inc. v. FNC, Inc.,* 634 F.3d 787, 803 fn. 44 (5th Cir. 2011)).  Even post

*Iqbal* and *Twombly*, facts which are peculiarly within a defendant's knowledge or state of mind

"need not be pled with particularity under Rule 9(b); [they] need only be pled plausibly pursuant to Rule 8." *U.S. v. Bollinger Shipyards, Inc.*, 775 F.3d 255, 260 fn. 13 (5th Cir. 2014), citing *Iqbal*, 556 U.S. 686 - 87.

**A.     The FCA public disclosure bar is no defense.**

The FCA contains a provision barring *qui tam* actions based upon the public disclosure of allegations or transactions from certain specified sources. 31 U.S.C. § 3730(e)(4)(A).  The provision at issue in Jackson HMA's Motion to Dismiss is the media disclosure provision.

> The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed -
> . . .
>   (iii) from the news media,
>
> unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A)(iii).  The origin of Jackson HMA's news media public disclosure bar defense is the February 22, 2014 Clarion Ledger article for which Relator Vanderlan was the unnamed source.[16]  Pursuant to the news media public disclosure bar, Relator Vanderlan's FCA Complaint would only be subject to dismissal if Relator Vanderlan obtained information first from the news media and then presented it to the Government.

The Fifth Circuit has identified a three part test for the public disclosure bar:  1) whether there has been a public disclosure of allegations or transactions, 2) whether the *qui tam* action is based upon such publicly disclosed allegations, and 3) if so, whether the relator is the original source of the information.  *Jamison v. McKesson Corporation,* 649 F.3rd 322, 327 (5th Cir. 2011).  The

---

[16] Exhibit "1" - *Trauma Transfers Could Put Lives at Risk* (Clarion Ledger February 22, 2014).

inquiry into and application of the news media public disclosure bar is fact intensive. *U.S. ex rel. Garibaldi v. Orleans Parish School Board*, 21 F.Supp.2nd 607, 615 fn.2 (E.D.La. 1998) (rejecting the public disclosure bar where defendant produced no evidence that the federal government or relators obtained the disclosed information through the news media).

Discovery will show that Relator Vanderlan initially made a complaint to the OIG hotline describing in detail specific EMTALA violations at Merit Health Central. Relator Vanderlan followed this submission by providing patient files, documents, and records regarding Merit Health Central patients to investigators at HHS/CMS. Next, Relator Vanderlan made a submission to the DOJ. The initial submissions, interviews, and contacts occurred between January 1 and February 14, 2014, i.e., prior to the February 22, 2014 Clarion Ledger article.

Jackson HMA's public disclosure bar argument is fact intensive and requires this Court to refer to record evidence. Because reference to record evidence is necessary, Jackson HMA's public disclosure bar argument should be converted to a Rule 56 summary judgment motion consistent with Fed.R.Civ.P. 12(d). *See, Colony Ins. Co. v. D & S Enterprises of Natchez*, 11-cv-53-DPJ-FKB, 2011 WL 5138640, at *1, (S.D.Miss. Oct. 27, 2011).[17]

Jackson HMA's public disclosure bar defense is without merit.

**B.    <u>Relator Vanderlan has pled "express false certification" with the required specificity.</u>**[18]

The FCA creates civil liability for any person who:

---

[17] This Court cannot consider Jackson HMA's public disclosure bar defense without reference to the February 22, 2014 Clarion Ledger Article relied on by Jackson HMA as support. *See*, Jackson HMA Memorandum in Support of Motion to Dismiss: Doc. # 52, at p. 21, fn.5. A copy of the Article is attached at Exhibit "1".

[18] First Amended Complaint: Doc. # 50 at pp. 28-29, ¶¶ 117-124.

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . .

31 U.S.C. § 3729(a)(1)(A), (B).  A claim under the FCA can be either factually or legally false.  *U.S. ex rel. Wilkins v. United Health Group, Inc.*, 659 F.3d 295, 305 (3rd Cir. 2011).  *See, also, U.S. ex rel. Wall v. Vista Hospice Care, Inc.,* 778 F.Supp.2d 709, 717 (N.D.Tex.2011) (courts recognize legally or factually false claims under the FCA).  A claim is legally false when a claimant knowingly falsely certifies compliance with a statute or regulation.  *U.S. ex rel. Wilkins,* 659 F.3d at 305; *U.S. ex rel. Wall*, 778 F.Supp. at 717-18.  "A legally false FCA claim is based on a 'false certification' theory of liability."  *U.S. ex rel. Wilkins,* 659 F.3d at 305.  The false certification category is further divided into two types of false certification claims, express and implied.  *Id.*

Relator Vanderlan identifies 15 representative patient transfers, falsely certified as EMTALA compliant by Merit Health Central staff.  FAC ¶¶ 73-116.  The 15 patient cases are not "alleged" violations.  Each case was reviewed by Relator Vanderlan as part of his cooperation with CMS investigators.  Each case is a "confirmed" violation and formed the basis, in part, of CMS's May 13, 2015 Determination Letter.[19]  The breakdown of patients unlawfully transferred indicates a clear pattern of discrimination based on race and/or insured status:

| | |
|---|---|
| Uninsured African Americans | 9 |
| Insured African Americans | 2 |
| Medicaid Insured African American | 1 |
| Uninsured Hispanic | 1 |
| Uninsured Caucasian | 1 |
| Medicare Insured Caucasian | 1 |

---

[19] CMS Determination Letter: Doc. # 50-1

-13-

Consistent with the unlawful pattern of discrimination, the on-call trauma physician who failed to present, treat, and/or properly stabilize African American patients was white.[20]

As required by EMTALA regulations and consistent with Merit Health Central emergency department record keeping, the medical records of every trauma patient transferred from Merit Health Central included a "PHYSICIAN CERTIFICATION" containing the following representations:

> The patient has an emergency medical condition that this hospital has attempted to stabilize and/or treat to the extent possible given the Hospital's capacity and capabilities. However, based on the information available to me at the time of transfer, **I certify** that the medical benefits expected from the provision of appropriate medical care at another facility out weigh the increased risks to the individual and, in the case of a patient in labor, the unborn child associated with the transfer of the patient to the receiving facility. . . .[21]

The "Physician Certification" would be executed by the Merit Health Central "Transferring Physician" and/or other Merit Health Central "Qualified Medical Personnel."[22] *See also,* 42 C.F.R. § 489.24(e)(1)(ii)(B),(C) (if transfer occurs, a physician or qualified medical person must certify that the transfer conditions of EMTALA have been met, and "the certification must contain a summary of the risks and benefits of the transfer").

Jackson HMA suggests "Vanderlan has failed to allege that even a single Medicare or

---

[20] As described, the representative patients presented with multiple gunshot wounds, a stab wound, MVA trauma, head trauma and other life threatening injuries which met Code Alpha criteria. In most cases, the on-call trauma surgeon was called but did not present prior to transfer. In the cases where he did present, he did not treat and instead ordered transfer. The 15 EMTALA violations identified are representative, only. The actual number identified as a result of the information provided by Relator Vanderlan will be determined through discovery.

[21] Merit Health Central Emergency Department Transfer Form: Doc. # 50-3.

[22] *Id.*

-14-

Medicaid claim submitted by Jackson HMA was misleading for failure to disclose the alleged EMTALA violations."[23]  This statement is not true.  CASE 11 Patient No. XXX194 was a Medicare insured Caucasian female trauma patient that presented with a subarachnoid (brain) hemorrhage, pelvic fracture, and tibial plateau fracture.  FAC ¶¶ 104-105.  Patient XXX194 was never seen by a trauma surgeon and was transferred in violation of EMTALA.  *Id.*  CASE 15 Patient No. XXX886 was a Medicaid insured African American male that presented with a traumatic brain injury from a suicide attempt (gunshot).  FAC ¶¶ 114-116.  Patient XXX886 was never seen by a trauma surgeon and was transferred in violation of EMTALA. *Id.*  Discovery will reveal how many Medicare and Medicaid patients were unlawfully transferred during the relevant time period.  However, for purposes of Jackson HMA's Motion,  Relator Vanderlan has pled 15 proven express false certifications by Merit Health Central staff, two of which involved Medicare or Medicaid patients.

**C.**      **Relator Vanderlan has pled "implied false certification" with the required specificity.**[24]

Implied false certification "attaches when a claimant seeks and makes a claim for payment from the Government without disclosing that it violated regulations that affected its eligibility for payment."  *U.S. ex rel. Wilkins,* 659 F.3d at 305.   "As the theory goes," if the defendant submits a claim and fails to disclose "the defendant's violation of a material statutory, regulatory, or contractual requirement" such defendant will have made a misrepresentation "that renders the claim 'false or fraudulent' under § 3729(a)(1)(A)."  *U.S. ex rel. Escobar,* 136 S.Ct. at 1995.

Relator Vanderlan's implied false certification claim under the FCA arises from allegations that Jackson HMA opted into and was obligated to comply with EMTALA as a condition of

---

[23] Jackson HMA Memorandum in Support of Motion to Dismiss: Doc. # 52, at p. 13.

[24] First Amended Complaint: Doc. # 50 at pp.30-32, ¶¶ 125-133.

receiving payments from the Medicare program. 42 U.S.C. 1395cc(a)(I)(i). Jackson HMA takes the position that: "Compliance with EMTALA is not a condition of payment for individual Medicare or Medicaid claims."[25] Instead, Jackson HMA suggests that compliance with EMTALA is a requirement of "participation" and cannot create a basis for implied false certification.

Prior to June 2016, there was limited authority supporting Jackson HMA's position.[26]  In June 2016, the Supreme Court expressly rejected the arbitrary participation vs. condition of payment distinction in *U.S. ex rel. Escobar*.  Specifically, the Supreme Court rejected the requirement that the violated regulation had to be an express condition of payment, as follows:

> We further hold that False Claims Act liability for failing to disclose violations of legal requirements does not turn upon whether those requirements were expressly designated as conditions of payment.  Defendants can be liable for violating requirements even if they were not expressly designated as conditions of payment . . . **What matters is not the label the Government attaches to a requirement, but whether the defendant knowingly violated a requirement that the defendant knows is material to the Government's payment decision**.  (emphasis added).

*Id.* at 1996.  Just like Jackson HMA, the defendant in *Escobar* made the same "condition of payment" argument. Before being reversed by the Supreme Court, the district court found "none of the regulations that [defendant] violated was a condition of payment."  *U.S. ex rel Escobar*, 136 S.Ct. at 1998, citing from the lower court decision 2014 WL 1271757, *1, *6-*12.   To the extent there may have been a dispute in the law, Jackson HMA's position has been expressly rejected and the

---

[25] Jackson HMA Memorandum in Support of Motion to Dismiss: Doc. # 52, at p. 14.

[26] *See, U.S. ex rel. Connor v. Salina Regional Health Center, Inc.*, 543 F.3d 1211, 1221 (10th Cir. 2008) (certification of compliance with Medicare regulations and statutes are requirements of Medicare participation, not payment).  *But see Baker County Medical Services, Inc. v. U.S. Atty. Gen.*, 763 F.3d 1274, 1277 (11th Cir. 2014) ("[a]s a condition of participating in **and** receiving payments from Medicare" a hospital must opt into and comply with EMTALA").  *Id.* at 1277.

matter settled in favor of Relator Vanderlan.

Prior to *Escobar*, the Circuits were split on whether implied false certification was even a viable theory of liability under the FCA.[27]  Through its grant of *certiorari*, it was the purpose of the Supreme Court to answer two questions: (1) whether implied false certification was a viable theory under the FCA; and, if so, (2) was it limited to cases only where the certification in question related to a condition of payment.  *U.S. ex rel. Escobar*, 136 S.Ct. 582 (2015) (granting *certiorari* on two questions).  *See also, U.S. ex rel. Escobar,* 136 S.Ct. at 1989 (answering both questions as part of holdings).  The Supreme Court found that implied certification was a basis for liability under the FCA, where two conditions are satisfied:

> [F]irst, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations **misleading half-truths**.  (emphasis added).

*U.S. ex rel. Escobar*, 136 S.Ct. at 2001.

## Representations about Services

Each time that Merit Health Central transferred a patient in violation of EMTALA, one of its "qualified medical person[s]" falsely certified that the transfer conditions of EMTALA had been met.[28]  *See also* 42 C.F.R. § 489.24(e)(1)(ii)(B),(C) (if transfer occurs, a physician or qualified medical person must certify that the transfer conditions of EMTALA have been met, and "the certification must contain a summary of the risks and benefits of the transfer").  Jackson HMA is

---

[27] The Fifth Circuit adopted "implied false certification" as an FCA theory of liability in *U.S. ex rel. Wilkins v. United Health Group*, 659 F.3d 295, 306 (5th Cir. 2011).

[28] Merit Health Central Emergency Department Transfer Form: Doc. #50-3.

incorrect to suggest that a claim under the FCA is only actionable based on proof of a "specific representation in a reimbursement claim."[29]   In *U.S. ex rel. Longhi*, the Fifth Circuit delineated the first element of an FCA claim as: (1) whether there was a false statement **or fraudulent course of conduct**. *U.S. ex rel. Longhi v. U.S.*, 578 F.3d 458 (5th Cir. 2009).   An FCA claim does not arise solely from proof of a specific false statement relating to a specific reimbursement claim for a specific patient.   Liability can arise from "misleading half-truths" relating to a fraudulent course of conduct.   *U.S. ex rel. Escobar*, 136 S.Ct. at 2001.   The test now is whether the "representations were clearly misleading in context."   *Id.* at 2000.

It is crucial for this Court to look into the reasoning of the *Escobar* Court and, more specifically, the manner in which the *Escobar* Court analyzed FCA claims under principles of federal law and general universal principles of common-law fraud.   For example, the FCA does not define what makes a claim "false" or "fraudulent."   Therefore, in *Escobar*, the Supreme Court informed lower courts to apply common-law fraud principles to decide what types of claims are actionable.[30]

To begin, the Supreme Court in *Escobar* rejected Jackson HMA's argument that there can be no FCA liability when claims were simply submitted, but no specific fraudulent representations were made.[31]   Citing principles of common-law fraud, the Supreme Court held that the relator's

---

[29]   Jackson HMA Memorandum in Support of Motion to Dismiss: Doc. # 52, at p. 12.

[30]   Throughout its Opinion, the Supreme Court cited principles of the Restatement (Second) of Torts and the Restatement (Second) of Contracts. *U S ex rel. Escobar*, 136 S.Ct. at 1999-2000, 2000 fn. 3, 2001, 2001 fn. 4, 2003, and 2003 fn. 5.

[31]   "Universal Health, on the other hand, argues that submitting a claim involves no representations, . . . ." *U.S. ex rel. Escobar*, 136 S.Ct. at 2000.   Jackson HMA argues "Vanderlan . . . cannot demonstrate that Jackson HMA's failure to disclose the alleged violations make any of Jackson HMA's Medicare or Medicaid reimbursement claims misleading." Jackson HMA Memorandum in Support of Motion to Dismiss: Doc. # 52, at p. 10.

claims "[fell] squarely within the rule that **half-truths** - - representations that state the truth only so far as it goes, while omitting critical qualifying information - - can be actionable misrepresentations." (emphasis added).  *U.S. ex rel. Escobar,* 136 S.Ct. at 2000.[32]  Arguing similar to Jackson HMA, the healthcare provider in *Escobar* suggested that a misrepresentation would be fraudulent "only when the initial statement partially disclosed unfavorable information."[33]  *Id.*, at p. 2001, fn. 4.  Rejecting this alternative position, the Supreme Court opined: "[A] statement that contains only favorable matters and omits all reference to unfavorable matters is as much a false representation as if all the facts stated were untrue."  *Id.*, citing Restatement (Second) of Torts § 529, Comment a, pp. 62-63 (1976).

Applying this reasoning, Jackson HMA submitted "half-truths" regarding the 15 representative patients in Relator Vanderlan's First Amended Complaint, and, more importantly, regarding the two patients for which Jackson HMA received government funds.

During the relevant time frame, Merit Health Central held itself out to the public as a Level III trauma hospital obligated by state law to have immediate 24 hour coverage for emergency medicine, **trauma surgery**, general surgery, orthopedic surgery, anesthesia, post-anesthesia care,

---

[32] The U.S. Supreme Court recognized that the rule "recurs throughout the common law," i.e., "if the defendant does speak, he must disclose enough to prevent his words from being misleading."  *U.S. ex rel. Escobar,* 136 S.Ct. at p. 2000, fn. 3, citing Keeton, Dobbs, Keeton, & Owen, Prosser and Keeton on Law of Torts § 106, p. 738 (5th Ed. 1984); and Restatement (Second) of Contracts § 161, Comment a, p. 432 (1979).

[33] Jackson HMA asks this Court to accept that Relator "Vanderlan has not shown that any claim submitted with respect to [a] patient included specific, misleading disclosures regarding the services that were provided to that patient." Jackson HMA Memorandum in Opposition to Preliminary Injunction: Doc. # 39, at p. 17.  This position is incorrect.  As discussed *supra*, each EMTALA patient case contained a false certification that the unlawful transfer was in compliance with the law.

and intensive care.[34] As pled in Relator Vanderlan's First Amended Complaint, Merit Health Central had neurosurgery coverage and should have been providing treatment through its emergency department as a Level II trauma hospital.  FAC ¶ 46.  Merit Health Central's "half-truth's" regarding these patients was  failing to disclose that such patients did not receive adequate medical screening, were not seen by a trauma surgeon, were not provided stabilizing treatment, and were inappropriately transferred.  FAC ¶¶ 104-105; 114-115.

In *Escobar*, the relators' teenage daughter was covered under the Massachusetts Medicaid Program and was receiving psychiatric counseling services for bipolar disorder from a clinic operated by Universal Health Services.  *U.S. ex rel. Escobar*, 136 S.Ct. at 1997.  The "half truths" found material to the government's payment position were: the diagnosing "Ph.D." practitioner's failure to mention her degree was obtained from the Internet and her application to be a licensed psychologist was rejected, and, the prescribing "psychiatrist's" failure to mention that she was actually a nurse.  *Id.*  The following State investigation revealed that 23 employees of Universal Health lacked licenses to provide mental health services and reveled over a dozen State Medicaid violations.[35]  *Id.*

There was no allegation in *Escobar* that the defendant submitted claims to the Massachusetts Medicaid program with specific false representations.  The Supreme Court held that Universal Health had defrauded the Massachusetts Medicaid program which would not have reimbursed otherwise legitimate claims had it known that it was being billed for mental health services

---

[34] Mississippi Trauma Care System Regulations Rule 1.3.12.

[35] The Universal Health employees were in violation of the training, qualification, and licensing requirements of 130 Code Mass. Regs. § 429.422 and § 429.424(C). *U.S. ex rel. Escobar*, 136 S.Ct. at 1998.

performed by unlicensed staff.  *Id.* at 1998.  The key to the Supreme Court's decision was the finding

that the "representations were clearly misleading in context." *Id.* at 2000.

By submitting otherwise legitimate claims for payment using payment codes corresponding

to specific counseling services, "without disclosing [the clinic's] many violations of basic staff and

licensing requirements for mental health facilities, Universal Health's claims constituted

misrepresentations." *Id.* at 2001 The Supreme Court's reasoning was summed up in two parts of its

Opinion:

> When, as here, a defendant makes representations in submitting a
> claim but omits its violations of statutory, regulatory, or contractual
> requirements, those omissions can be a basis for liability if they
> render the defendant's representations misleading with respect to the
> goods or services provided.

*U.S. ex rel. Escobar*, 136 S.Ct. at 1999.

> Anyone informed that a social worker at a Massachusetts mental
> health clinic provided a teenage patient with individual counseling
> services **would probably - - but wrongfully - - conclude** that the
> clinic had complied with core Massachusetts Medicaid requirements
> . . . . (emphasis added).

*Id.* at 2000.

Likewise, the 15 representative patients presenting to the Merit Health Central emergency

department during the relevant time frame "probably–but wrongfully–concluded" they were entitled

to treatment within the capability of the hospital's emergency department staff.  42 U.S.C.

§ 1395dd(a); and, 42 C.F.R. § 489.24(a)(1)(i).  Such patients "probably–but wrongfully–concluded"

they would be treated and admitted or stabilized and receive an appropriate transfer.  42 U.S.C.

§ 1395dd(b)(1); and, 42 C.F.R. § 489.24(a)(1)(ii).  *See also,* 42 C.F.R. § 489.24(e)(1) (if a patient

has not been stabilized, the hospital may not transfer unless certain conditions are met).  Such

-21-

patients "probably–but wrongfully–concluded" they would not be discriminated against on the basis of source of payment or ability to pay.  42 U.S.C. § 1395dd(h); and, 42 C.F.R. § 489.24(d)(4)(i) (hospital may not delay providing appropriate medical screening to inquire about individual's method of payment or insurance status).

Jackson HMA has responded to Relator Vanderlan's Motion for Preliminary Injunctive Relief [39] and filed a separate Memorandum in Support of its Motion to Dismiss [52].  As the pleadings now stand, Jackson HMA has not disputed the diagnosed medical conditions of the 15 representative patients, has not disputed the cases in which its on-call trauma surgeon or other required staff failed to present, and has  not disputed the transfers to UMMC.  Jackson HMA has not disputed the findings in CMS's Determination Letter confirming an "immediate threat and jeopardy to the health and safety of any individual who comes to [Merit Health Central] with an emergency medical condition."

Relator Vanderlan has met the first element of *Escobar*, i.e., specific false representations and/or misleading half-truths about services constituting a fraudulent course of conduct.  Indeed, Relator Vanderlan has done so through allegations that, as yet, have not been disputed.

**D.**     **Jackson HMA's false certifications were material to the Government's payment position**

"[A] false statement is material if it has a 'natural tendency to influence, or [is] capable of influencing, the decision of the decision making body to which it was addressed.'" *U.S. ex rel. Longhi,* 575 F.3d at 468 (additional citations omitted).  The Fifth Circuit further defined the "natural tendency test" as follows:

> Thus, the "natural tendency to influence or capable of influencing"
> test requires only that the false or fraudulent statements either (1)

> make the Government prone to a particular impression, thereby
> producing some sort of effect or (2) have the ability to effect the
> Government's actions, even if this is a result of indirect or intangible
> actions on the part of the Defendants. All that is required under the
> test for materiality, therefore, is that the false or fraudulent statements
> have the potential to influence the Government's decisions.

*U.S. ex rel. Longhi*, 575 F.3d at 470.  Relator Vanderlan agrees, materiality is a component of each

of his FCA claims.  "A misrepresentation about compliance with a statutory, regulatory, or

contractual requirement must be material to the Government's payment decision in order to be

actionable under the False Claims Act."  *U. S. ex rel. Escobar*, 136 S.Ct. at 2002.

Identical to the Fifth Circuit "natural tendency test," the FCA defines materiality using

language found in other federal fraud statutes: "[T]he term 'material' means having a natural

tendency to influence, or be capable of influencing, the payment or receipt of money or property."

*Id.*, citing 31 U.S.C. § 3729(b)(4). In addition, citing familiar principles of tort law, the Supreme

Court in *Escobar* directed lower courts to determine materiality based upon a reasonable man

standard or a standard based upon whether the defendant "knew or had reason to know" that the

recipient of the representation would attach importance to the specific matter in determining a choice

of action.  *U. S. ex rel. Escobar*, 136 S.Ct. at 2002-03, citing Restatement (Second) of Torts § 538,

at 80.  Similar familiar principles of contract law would also apply: A misrepresentation is material

if it would "likely...induce a reasonable person to manifest his assent," or if the defendant "knows

for some special reason [the representation] is likely to induce the particular recipient to manifest

his assent."  *U. S. ex rel. Escobar*, 136 S.Ct. at 2003, citing Restatement (Second) of Contracts

§ 162(2).

-23-

To further define what constitutes materiality under the FCA, the Supreme Court opined: "What matters is not the label the Government attaches to a requirement, but whether the defendant knowingly violated a requirement that the defendant knows is material to the Government's payment decision." *Id.* at 1996. Although Jackson HMA dutifully argues *Escobar* instead of running away from its reasoning, Jackson HMA clearly wants to take this Court back to pre-*Escobar* days when it asks for the following label on EMTALA compliance: "Compliance with EMTALA is not a condition of payment for individual Medicare or Medicaid claims."[36] Instead of affirming Jackson HMA's "label," this Court is obligated to look into whether Jackson HMA knew failure to certify compliance with EMTALA and/or false certification of compliance with EMTALA would negatively effect Jackson HMA's payments under the Medicare program.

To receive payments under the Medicare program, Jackson HMA had to file with HHS an agreement "to adopt and enforce a policy to ensure compliance with the requirements" of EMTALA. 42 U.S.C. § 1395cc(a)(1)(I)(i). *See also*, 42 C.F.R. § 489.24(a) through (e) (EMTALA compliance regulations); and, 42 C.F.R. § 489.20(m), (q), and (r) (EMTALA reporting regulations); *Deron v. Wilkins*, 879 F.Supp. at 607 (hospitals which execute Medicare provider agreements are required to treat all patients who enter their emergency departments in accordance with EMTALA). Any hospital found in violation of the compliance or reporting requirements of EMTALA is subject to having its Medicare program agreement terminated. 42 C.F.R. § 489.53(b)(1)(A) (EMTALA compliance); and, § 489.53(b)(2) (EMTALA reporting).

If CMS finds that a hospital is in violation of EMTALA and "the violation poses immediate jeopardy to the health or safety of individuals who present themselves to the hospital for emergency

---

[36] Jackson HMA Memorandum in Support of Motion to Dismiss: Doc. # 52 at p. 14.

services" CMS can begin the process of termination by providing the hospital with preliminary notice indicating that its provider agreement will be terminated within 23 days.  42 C.F.R. §489.53(d)(2)(i)(A).  A final notice of termination, and concurrent notice to the public, must take place at least two but no more than four days before the effective date of termination of the hospital's provider agreement.  42 C.F.R. § 489.53(d)(2)(i)(B).

Consistent with these procedures, CMS served its Determination Letter on May 13, 2015.[37] CMS's Determination Letter contained the required statutory finding that Merit Health Central had violated EMTALA § 489.24 (compliance violations) and § 489.20 (reporting violations), and that an "Immediate Jeopardy existed based on the following:"

- ■  Failure to provide "On-Call" physicians who were available;

- ■  Failure to provide stabilizing treatment;

- ■  Failure to provide an adequate medical screening; and,

- ■  Failure to provide appropriate transfers.[38]

CMS's Determination Letter included the required regulatory finding:  "We have determined that the deficiencies are so serious that they constitute an immediate threat and jeopardy to the health and safety of any individual who comes to your hospital with an emergency medical condition."[39] Finally, CMS notified Jackson HMA of the June 5, 2015 statutory termination date, i.e., 23 calendar days as required by § 489.53(d)(2)(i)(A).

---

[37] CMS Determination Letter: Doc. # 50-1.

[38] *Id.*

[39] *Id.*

Jackson HMA argues lack of materiality based on CMS's failure to immediately revoke Merit Health Central's Medicare provider agreement and failure to immediately cut off Medicare funds.[40] This argument is of no moment.   CMS was obligated to begin and did follow the statutory termination process which does not provide for immediate termination.   Again, *Escobar* is instructive.

The government in *Escobar* did not terminate payments, and did not intervene to recover payments until **after** the Supreme Court ruled in favor of the relator. *U.S. ex rel. Escobar*, 136 S.Ct. at 1998.  Without establishing specific guidelines for district courts to follow, the Supreme Court identified several "proofs" for courts to review when deciding materiality.  For example, proof that the Government designated a regulatory provision as a condition of payment is not dispositive. *U.S. ex rel. Escobar*, 136 S.Ct. at 2003.  The proof most relevant to the instant inquiry is whether the Government "signaled . . . [a] change in position" after knowledge that "certain requirements were violated." *Id.*[41]  Beginning the process to terminate Jackson HMA's provider agreement signals a clear and negative change in position, confirming that compliance with EMTALA is material to the Government's payment position.

---

[40] "CMS did not immediately revoke the hospital's Medicare provider agreement, did not cut off Medicare funds to the hospital, and did not demand repayment of any funds paid..." Jackson HMA Memorandum in Support of Motion to Dismiss: Doc. # 52, at p. 15.

[41] In *Escobar*, the Supreme Court stated this proof in the negative, i.e., if the Government pays claims with knowledge of the violation and has signaled "no change in position," that is evidence the requirement is not material. *U.S. ex rel. Escobar*, 136 S.Ct. at 2003-04.

**E.**     **If a violation of general Medicare regulations can form the basis of an FCA case, additional specific violations of EMTALA should form an even stronger case.**

Jackson HMA correctly notes that there is no prior FCA case premised on alleged EMTALA violations.[42]  However, at least one district court in this- Circuit, post *Escobar*, has considered whether false compliance certifications with general Medicare laws and regulations can form the basis of an FCA claim.  In *Waldmann v. Fulp*, No. 13-cv-495, 2016 WL 9711525 (S.D.Tex. Oct. 13, 2016), the Southern District of Texas answered the question in the affirmative.

In *Waldmann*, the relator filed a *qui tam* case against a hospital (MMC) and its doctor (Fulp) alleging false certifications with general Medicare regulations.  *Id.* at *12.  Specifically, the relators in *Waldmann* alleged that the defendant providers had submitted a "number of certifications" with healthcare laws and regulations in three different ways: "(i) in CMS Provider Agreements filed annually by [the hospital], (ii) in Annual Cost Reports filed [by the doctor and hospital], and (iii) in the EDI enrollment forms [the hospital and doctor] signed to enroll as providers."  *Id.*  The "falsity" of these certifications arose, in part, from a pattern and practice at the hospital whereby the defendant physician would claim performing medical procedures on patients while in reality the procedures were performed in whole or in part by other individuals, none of whom were licensed to practice medicine.  *Id.* at *1.

Identical to Jackson HMA's argument, the defendants in *Waldmann* argued certification of compliance with Medicare regulations constituted a classic example of a general promise to follow the law, and, as such, were not "Medicare condition[s] of payment."  *Id.* at *12.  The *Waldmann* Court rejected the argument on the basis that it conflicted with Fifth Circuit precedent and the

---

[42] Jackson HMA Memorandum in Support of Motion to Dismiss: Doc. # 52 at p. 8.

Supreme Court's recent decision in *Escobar*. *Id.* In rejecting the defendants' argument, the *Waldmann* Court "relie[d] on the Supreme Court's explicit rejection of lower courts' over-reliance on the phrases 'condition of payment' and 'condition of participation' as used in Medicare certifications." *Waldmann*, 2016 WL 9711525, at *14, citing *U.S. ex rel Escobar*, 136 S.Ct. at 1996.

The *Waldmann* court summarized its findings as follows:

> As in *Universal Health Services [Escobar]*, the Court finds that, by submitting claims for payment for surgical services, MMC and Fulp represented that (sic) compliance with material Medicare regulations. The Court finds that this to be true whether or not Fulp and MMC had signed the CMS provider agreements. The Court further finds that the compliance certification signed by Fulp and MMC give rise to a false claim if Fulp or MMC fail to comply with "laws and regulations regarding the provisions of healthcare services," including but not limited "Medicare laws, regulations, and program instructions."

*Waldmann*, 2016 WL 9711525, at *15.

These same general Medicare regulatory certifications which supported an FCA claim in *Waldmann* are in this case, but not primarily relied on by Relator Vanderlan. Jackson HMA, like the defendants in *Waldmann*, was obligated to sign and file "certain agreements and certifications with the secretary of HHS." FAC ¶ 29. *See, Waldmann*, 2016 WL 9711525, at *12 (MMC and Fulp were required to sign a Medicare Provider Agreement). Additional certifications arose from Annual Medicare Cost Reports and Medicare EDI enrollment forms. *Waldmann,* 2016 WL 9711525, at *12. With certainty, discovery will disclose that Jackson HMA, in addition to executing a Medicare Provider Agreement, filed Annual Medicare Cost Reports and submitted EDI enrollment forms containing certifications similar to those which formed the basis of the FCA claims in *Waldmann*. However, as indicated above, Relator Vanderlan will not be relying primarily on Jackson HMA's general false certifications. Armed with numerous specific proven false certifications regarding

-28-

compliance with EMTALA, Relator Vanderlan can present a stronger and more substantive FCA case than the case which withstood summary judgment in *Waldmann*.

**F.**     **Relator Vanderlan has pled a reverse FCA claim with the required specificity.**[43]

In a reverse FCA claim, there is no improper payment by the government to the defendant. Rather, there is an allegation of an "improper reduction in the defendant's liability to the Government." *U.S. ex rel. Marcy v. Rowan Companies, Inc.*, 520 F.3d 384, 390 (5th Cir. 2008). Liability for a reverse FCA claim arises when a defendant knowingly makes a false record or statement to avoid an obligation to pay money to the government. 31 U.S.C. § 3729(a)(1)(G). *See also, U.S. ex rel. Doe v. Lincare Holdings, Inc.*, No. 15-cv-19-DCB-MTP, 2017 WL 752288, at *7 (S.D. Miss. Feb. 27, 2017). While there are four components to a reverse FCA claim,[44] the issue raised focuses on whether the obligation owed by Defendants was solely in the nature of a regulatory fine. *See, e.g., U.S. ex rel. Simoneaux v. E.I. duPont de Nemorus and Co.*, 843 F.3d 1033, 1036 (5th Cir. 2016) (discretionary regulatory fines are not mandatory and do not constitute an "obligation to pay" for purposes of the FCA). However, simply characterizing fines as regulatory does not automatically take such recovery outside of the FCA.[45]

Where the relationship is purely regulatory, the fines are discretionary/regulatory fines outside of the FCA. Where the relationship between the government and the defendant is economic and involves the payment of federal funds, such fines can constitute an avoided obligation to pay for

---

[43] First Amended Complaint: Doc. # 50 at pp. 32-33, ¶¶ 134-138.

[44] *U.S. ex rel. Doe*, 2017 WL 752288, at *7.

[45] Indeed, the FCA specifically authorizes civil fines and penalties, as adjusted for inflation. 31 U.S.C. § 3729(a)(1)(G).

purposes of a reverse FCA claim.[46]

Evaluation of a reverse FCA claim in this Court regarding recovery of fines begins with *U.S. ex rel. Bain v. Georgia Gulf Corp.*, 386 F.3d 648 (5th Cir. 2004). In *U.S. ex rel. Bain*, an employee/relator attempted to state a claim under the FCA arising from Georgia Gulf's obligations to pay regulatory fines relating to chemical manufacturing permits issued by the Louisiana Department of Environmental Quality ("LDEQ") and the Environmental Protection Agency ("EPA"). *Id.* at 650-651.[47] The Fifth Circuit found that in the absence of an economic relationship between the Government and the defendant, such relationship was "obviously purely regulatory" and could not form the basis for a reverse FCA claim. *Id.* at 657.

The Fifth Circuit's reasoning was refined in *U.S. ex rel. Marcy v. Rowan Companies, Inc.*, 520 F.3d 384 (5th Cir. 2008). In *U.S. ex rel. Marcy*, the relator asserted an FCA claim based on allegations that the defendant oil and gas drilling companies had fraudulently avoided civil finds and penalties under the Federal Water Pollution Control Act ("FWPCA"), the Act to Prevent Pollution from Ships ("APPS"), the Oil Pollution Act of 1990 ("OPA"), and the Outer Continental Shelf Lands Act ("OCSLA"). *Id.* at 387. The relator attempted to assert something more than a regulatory relationship between the Government and the defendant arising out of the Government's grant of an oil and gas lease. *Id.*

---

[46] Jackson HMA relies on cases out of the Fifth Circuit, *U.S. ex rel. Bain, U.S. ex rel. Marcy,* and *U.S. ex rel Simoneaux*. The defendants/entities in each case were subject to fines solely because of their participation in a regulated industry, e.g. chemical manufacture of PVC - *U.S. ex rel Bain*; extraction of oil and gas - *U.S. ex rel. Marcy*; and, chemical manufacture of sulphur - *U.S. ex rel. Simoneaux*.

[47] The relator's reasoning was that defendant Georgia Gulf had prevented the Government from collecting fines and penalties that the Government could have imposed and received if Georgia Gulf's record reporting had been accurate. *Id.* at 655.

-30-

The Fifth Circuit refused to adopt a strict standard in a reverse FCA claim requiring that the avoided obligation had to be fixed and determined. *U.S. ex rel. Marcy*, 520 F.3d at 390-91. Citing *U.S. ex rel. Bain*, the Fifth Circuit adopted the Government's "intermediate position," as follows:

> [The government] suggested that a fixed and definite obligation was not always necessary for (a)(7) liability.[48]  But, the government emphasized, a potential obligation has to arise out of the contractual or other close relationship between a defendant and the federal government.

*U.S. ex rel. Marcy*, 520 F.3d at 391, citing *U.S. ex rel. Bain*, 386 F.3d at 657-658.  The Fifth Circuit found that the necessary obligation to create a reverse FCA claim did not exist between the defendant drilling companies and the Government, because the defendants were only "engaged in the physical extraction of natural resources belonging to the United States, [and] did not request or demand money or property from the United States."  *U.S. ex rel. Marcy*, 520 F.3d at 388.

The most recent pronouncement regarding a reverse FCA claim came in *U.S. ex rel. Simoneaux*, involving another chemical manufacturing defendant, where the Fifth Circuit considered the FERA amendment to the FCA defining "obligation" for purposes of a reverse FCA claim as:

> an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment.

*U.S. ex rel. Simoneaux*, 843 F.3d at 1036, quoting 31 U.S.C. § 3729(b)(3).  The Fifth Circuit identified three characteristics of "obligations": (1) they must be established duties; (2) they need not be fixed; and, (3) they can arise from a list of sources, including statutes and regulations.  *Id.* at

---

[48] The Fraud Enforcement and Recovery Act of 2009 ("FERA") amended the FCA and re-designated § 3729(a)(7) to § 3729(a)(1)(G).  *See, U.S. ex rel. Simoneaux*, 843 F.3d at 1035-1036.  For a more complete discussion of the FERA amendments and the re-designation of other Sections of the False Claims Act, *See U.S. ex rel. Wilkins*, 659 F. 3d at 303.

1037.  The issue raised in this case does not implicate factors (2) or (3).[49]  Whether the Government's intent to fine Merit Health Central under EMTALA creates an "obligation" for purposes of a reverse FCA claim focuses on factor (1), i.e., whether the duty to pay is established. Once again, consideration must be given to the relationship between the Government and Defendants.[50]

First and foremost, the relationship between the Government and Defendants is not purely regulatory.   Based on participation in the Medicare program, Defendants continuously and consistently "request[ed] or demand[ed] money or property from the United States" in the form of Medicare program payments.  *See, e.g., U.S. ex rel. Marcy*, 520 F.3d at 389 (finding the absence of a reverse FCA claim relationship where the defendant drilling companies did not request or demand money from the United States).  With this undisputed economic relationship in place, this Court can next look to the more objective standard to determine whether an obligation exists, i.e., whether the Government is in the process of assessing the fine or penalty.  *See, U.S. ex rel. Simoneaux*, 843 F.3d at 1039 (finding no obligation where the Government had initiated no proceeding to assess a fine). While the existence of a formal proceeding is unclear, it is undisputed that the Government is in the process of assessing statutory fines and penalties against Defendants.[51]

Relator Vanderlan, consistent with the law in this Circuit, has pled a reverse FCA claim arising from Defendants' failure to disclose known violations of EMTALA while avoiding statutory

---

[49] The amount of the civil monetary penalty to be assessed under EMTALA is fixed at $50,000 for each violation and arises from statute.  42 U.S.C. § 1395dd(d)(1)(A).

[50] *U.S. ex rel. Simoneaux* did not overrule *U.S. ex rel. Bain* or *U.S. ex rel. Marcy*.  Throughout it's Opinion, the Fifth Circuit relied on the holdings in both cases.

[51] *See*, Relator's Motion for Preliminary Injunction: Doc. # 27.

fines and penalties.

**G.     Relator Vanderlan has pled a claim for retaliatory discharge.**[52]

Jackson HMA's challenge to Relator Vanderlan's retaliatory discharge claim is based upon an alleged failure to plead substantive claims under the FCA.  To constitute a protected activity for purposes of an FCA retaliatory discharge claim, a Relator's complaint must concern false or fraudulent claims for payment submitted to the Government.  *Thomas v. ITT Educational Services, Inc.*, 517 Fed.Appx. 259, 262 (5th Cir. 2013).  The plaintiff in *Thomas v. ITT* did not seek to pursue a *qui tam* action, did not inform defendant that any of its actions were illegal, and did not inform defendant that any of its actions were fraudulent.  *Id.* at 263.  Because the acts complained of were "well beyond the reach of the FCA," the Fifth Circuit found that plaintiff Thomas had failed to establish that she had engaged in protected activity.  *Id.*

Relator Vanderlan met with Jackson HMA staff and specifically informed them of systematic and ongoing EMTALA compliance violations in the Merit Health Central emergency department.  FAC ¶¶ 60-61.  Further, it is undisputed that Relator Vanderlan was the original source of the information disclosed to the Government that forms the basis of the *qui tam* case.[53]  Jackson HMA's only complaint regarding Relator Vanderlan's FCA retaliation claim is that the underlying wrongful acts disclosed, i.e., violations of EMTALA, do not concern false or fraudulent claims for payment submitted to the Government.  For the reasons discussed *supra*, Relator Vanderlan has pled merit based FCA claims that will support his claim for FCA retaliation

---

[52] First Amended Complaint: Doc. # 50, pp. 33-34, at ¶¶ 139-142.

[53] CMS Letter to Vanderlan: Doc. # 50-2.

-33-

**H.**   **Relator Vanderlan has pled a claim for injunctive relief.**[54]

Relator Vanderlan's claims for preliminary injunctive relief are as stated in his Motion for Preliminary Injunction [Doc. 27].

## IV. CONCLUSION

For the reasons stated, Jackson HMA's Motion to Dismiss Relator Vanderlan's First Amended Complaint should be denied.

DATED this the 21st day of November, 2017.

Respectfully submitted,

W. BLAKE VANDERLAN, M.D. by:

By:   */s/ C. VICTOR WELSH, III*
      C. VICTOR WELSH, III

## CERTIFICATE OF SERVICE

I, C. Victor Welsh, III, certify that a true and correct copy of the above pleading has been served by this Court's electronic filing system (CM/ECF) to counsel of record.

DATED this the 21st day of November, 2017.

By:   */s/ C. VICTOR WELSH, III*
      C. VICTOR WELSH, III

---

[54] First Amended Complaint: Doc. # 50, pp. 34-35, at ¶¶ 146-147.

-34-

OF COUNSEL:

C. VICTOR WELSH, III (MSB# 7107)
cvw@pgrwlaw.com
PITTMAN, GERMANY, ROBERTS & WELSH, L.L.P.
POST OFFICE BOX 22985
JACKSON, MS 39225-2985
(601) 948-6200 - PHONE
(601) 948-6187 - FAX


        AND

LANCE L. STEVENS (MSB # 7877)
lstevens@stevensandward.com
RODERICK D. WARD, III (MSB # 6953)
rward@stevensandward.com
1855 LAKELAND DRIVE, STE. Q-200
JACKSON, MS 39216
(601) 366-7777 - PHONE
(601) 366-7781- FAX


ATTORNEYS FOR PLAINTIFF/RELATOR,
W. BLAKE VANDERLAN, M.D.