# Trauma transfers could put lives at risk

By Brian Eason; 11:20 p.m. CST February 22, 2014

Buy Photo

(Photo: Rick Guy/The Clarion-Ledger )

CONNECTTWEETLINKEDINCOMMENTEMAILMORE

A for-profit hospital in south Jackson repeatedly transferred emergency patients it was paid by the state to treat, possibly violating state hospital regulations and federal law, a Clarion-Ledger investigation found.

The Clarion-Ledger obtained hospital transfer logs, patient charts and other documents leaked by whistle-blowers that depict a pattern of decisions at Central Mississippi Medical Center that may have put lives at risk.

Trauma victims were sent away at least 89 times in 2013, often with injuries that CMMC had the capacity to treat, according to hospital records. Some of the most severe cases were sent away quickly, without proper stabilizing treatments being administered or the on-call surgeon consulting with the patient, while others were kept for several hours, according to records. Still

other patients were sent away with common conditions such as collapsed lungs, an injury CMMC trauma surgeons are board-certified to treat.

Half of all CMMC trauma transfers stayed longer than 130 minutes, possibly violating a state standard established to ensure patients are getting to the proper level of care as quickly as possible.

In a page-long email to The Clarion-Ledger, CMMC spokeswoman Jana Fuss denied any wrongdoing by the hospital, saying "several factors" could justify a transfer.

"Patients are not transferred if we can accommodate them here at CMMC," Fuss wrote. "Several factors can lead to a patient transfer, such as diversion status when our maximum bed occupancy or staffed bed capacity has been reached. Even when our hospital is on diversion, we often receive trauma patients who arrive by private vehicle."

She also said the physicians who make the decision to transfer "have no knowledge of the patient's financial situation."

The hospital would not address specific cases, citing privacy regulations.

One of those cases, in May, involved a shooting victim sent to another hospital while his foot was still hemorrhaging badly enough to bleed through the pressure dressing applied to the wound. He recovered after a 10-day stint at the University of Mississippi Medical Center.

On Jan. 23, trauma surgeon Gregory Fiser didn't arrive at the hospital for 49 minutes after receiving a call to treat multiple gunshot wounds to the chest — nearly double the maximum time allowed by state regulations. The patient, 26-year-old James McAlister, died before the surgeon arrived.

It is not clear from the obtained documents whether the problems are isolated to trauma care, or if other transfers were improper.

Psych patients, for instance, were redirected at least 73 times in 2013 — despite the fact CMMC has more psychiatric beds, 29, than some of its most common receiving hospitals and a similar occupancy rate to UMMC, according to state records. CMMC also transferred patients who checked into its emergency department with common ailments such as pneumonia and cold and flu symptoms.

The Clarion-Ledger attempted to contact many current and former doctors and nurses at CMMC, but none would agree to be quoted. Some of them said they were afraid of losing their jobs and that physicians there no longer report violations internally for fear of repercussions.

CMMC is owned by a Florida-based hospital chain, Health Management Associates, which in the last two years has come under fire for alleged efforts to drive up profits by overbilling patients as well as Medicare and Medicaid. The New York Times in January reported that HMA is being investigated by the Department of Justice for a number of whistle-blower lawsuits, while

"60 Minutes" in 2012 reported HMA hospitals allegedly over-admitted patients for minor ailments, allowing the company to collect more from Medicare and Medicaid.

Amid the allegations, a pending $7.6 billion purchase of HMA by Community Health Systems was approved in January.

The issues identified at CMMC are unlike those detailed in the other investigations, in that patients are being sent away rather than brought in.

But CMMC has been reaping financial benefits from its status as a Level 3 state trauma center, a designation that allows CMMC to avoid a $758,000 annual fee to not participate in the state's trauma network, in addition to receiving stipends from the state trauma fund.

These stipends are designed to offset the costs of caring for patients who lack insurance and don't pay their bills. Many of the questionably transferred patients identified by The Clarion-Ledger were uninsured or covered by Medicaid.

How trauma works

The state trauma care network was established in 2003 to solve a problem: Emergency medical services are generally required to send patients to the closest hospital for treatment, but the closest hospital isn't the best place to treat every injury.

Once patients were taken in by the smallest hospitals, they often languished there, waiting nine to 10 hours on average to be transferred to the levels of care they needed. The national average is 90 minutes.

"Obviously, that was impacting the outcomes that we saw in a lot of the cases," said Jim Craig, director of health protection for the state Department of Health.

To fix this, detailed protocols were created.

Now ambulances may bypass the closest hospital, taking patients directly to the facilities they need.

But very little separates CMMC from the highest-level hospital in the state, the UMMC — recipient of 81 of CMMC's 89 trauma transfers last year.

"Places like River Oaks and Central Mississippi, they're Level 3 trauma centers, so the only care they cannot provide is neurosurgical capabilities," said Amber Kyle, the trauma director for UMMC. "The specialty that we have that sets us apart from the other hospitals in the area is the neurosurgical — head and spinal cord. We're also the only tertiary pediatric trauma center in the entire state."

Craig agreed, with the caveat that some neck injuries, too, might be too complex for a Level 3 center.

Indeed, CMMC transfer logs contain several instances of the above exceptions. But they also include gunshot wounds to the buttocks, legs, arms and abdomen — none of which would require neurosurgery; yet, doctors still approved transfers, saying that "a higher level of care" was needed. Some were pediatric patients, but many were adults.

Dr. Blake Vanderlan, chairman of the clinical care committee for the Central Mississippi Trauma Region, noted transfers still could be permissible "if the treating physician feels that the nature of the injury is beyond their level of skill."

"But," he added, "there are basic skills that surgeons and physicians need to have, and if the very basic procedures cannot be performed, then they shouldn't have that level designation."

One of these is treating a pneumothorax — a collapsed lung. Treatments for collapsed lungs are listed as "common and essential" procedures for all general surgeons certified by the American Board of Surgery, according to ABS records.

"That is something that any general surgeon should be able to handle," Vanderlan said, when asked about the injury. "In some cases, those are actually handled by nonsurgeons."

In January 2013, a patient was taken by ambulance to CMMC with a partially collapsed lung after a car crash. According to her chart, she had a 20 percent pneumothorax — a level that warrants observation to see if the situation improves on its own.

She stayed there under observation for 11 hours but hadn't recovered. At 7 a.m., she was transferred, apparently at the recommendation of Dr. David Schaffer, who wrote in her chart that CMMC didn't have any surgery beds and the hospital "does not immediately have the required specialist."

But CMMC did have specialists on call who could have handled the case. The on-call surgeon, according to the patient's chart, was Dr. James Rooks, a fellow with the American College of Surgeons and an ABS-certified general surgeon. He consulted with Schaffer hours before the transfer to recommend observation but never saw the patient himself. The charts do not indicate whether Rooks was called after the initial consultation.

Even absent Rooks, CMMC still should have been able to treat the lung. According to its website, CMMC also has cardiovascular and thoracic surgeons on call.

Months later in May, another patient with a similar diagnosis was sent away, this time at Rooks' advice but for a different reason. At 7:34 p.m., Rooks urged the transfer "since we are on ICU diversion." But according to Medcom logs obtained via public records request, CMMC was not placed on diversion until 7:55 — 21 minutes after the decision to transfer was made. CMMC was taken off diversion 3½ hours later.

Rooks would not comment.

The local trauma experts reached for the article each would not comment on whether CMMC was suspected of transferring patients improperly.

"All matters from all institutions in the region are discussed in closed committee," Vanderlan replied.

"University Medical Center will never say that a patient should have been cared for at a different hospital," Kyle said. "We are the trauma center, and we want the trauma patients. That's what we do."

In fact, UMMC does it so often that its emergency department wait times — 53 minutes on average before seeing a doctor — are among the highest in the state, according to federal data, and about double the national average of 28 minutes. CMMC patients wait an average of 41 minutes to be seen.

UMMC spokesman Jack Mazurak said the hospital manages the wait times to address life-threatening cases first. More than half of UMMC's 4,500 trauma patients in 2013 came from transfers, according to hospital records. The only trauma centers in the 15-county region that could lighten the load are CMMC and River Oaks Hospital; every other facility is operating as a Level 4.

Dr. Rick Carlton, chairman of the Central Mississippi Region Trauma Committee, acknowledged there have been growing pains with the transfer guidelines.

"Until fairly recently, it was pretty easy — the only Level 1 was here in Jackson, and then you had no Level 2s or 3s designated in the rest of the region," Carlton said. "I think people are interpreting it a little bit differently from what the intent is now."

Missed activations

While there is some gray area in which injuries should be treated by which facilities, the state trauma plan is clear about when hospitals should "activate" their trauma teams — and different activation codes set in motion a different response from emergency personnel.

If someone falls from a two-story building or is ejected from a car, the Bravo protocol is activated. For all penetrating injuries — such as gunshots, or stabbings — an Alpha activation is called.

But The Clarion-Ledger identified several cases where CMMC called the wrong code then transferred the patient without a consultation from the on-call surgeon.

In February 2013, a man was taken to the emergency room in a wheelchair after being shot in the abdomen — a clear Alpha situation, but a Bravo alert was called. Rooks eventually decided to transfer the patient "after a discussion of the case," but did not examine the patient himself, according to the charts.

In March, a woman walked in after being stabbed in the arm. CMMC called a UMMC ER physician, who recommended an Alpha activation, according to the patient's chart. After the patient had been at the hospital for 30 minutes already, CMMC called for a Bravo activation then transferred the patient 40 minutes later.

EMTALA

The state trauma requirements determine whether a hospital can keep its trauma designation, but the federal law governing emergency medicine has significantly more teeth.

Violations of the Emergency Medical Treatment and Labor Act are punishable by up to a $50,000 fine per violation for the hospital; a physician, too, can be punished if "he should have known that the benefits of transfer did not in fact outweigh the risks of transfer, or if he misrepresents the patient's condition or the hospital's obligations under the statute."

Lacking beds and staff are not viable excuses under EMTALA or the state regulations. EMTALA defines capacity as "whatever a hospital customarily does to accommodate patients in excess of its occupancy limits" — including calling in staff from home.

According to state regulations, "all hospitals shall have a designated trauma team consisting of physicians, specialists, nursing, and clinical ancillary personnel which would be either present or on-call and promptly available.

"Emergency department physicians must always be present in Level I, II and III hospitals and be available to Level IV hospitals."

Adequate staffing, too, is a requirement in all divisions.

Despite those requirements, on April 19, CMMC transferred a gunshot patient because the OR crew would be in that morning "but not at least for an hour and a half," Rooks wrote.

On at least three other occasions, patients were transferred because of a lack of beds in a certain division, like the ICU, or surgery.

CMMC echoed these reasons in an email to The Clarion-Ledger explaining the transfers, noting that CMMC was on diversion several times in the last year.

However, under EMTALA, hospitals could be required to accommodate patients by moving them to other units. As one example, if the ICU is full, a patient could be housed in the post-anesthesia care unit.

On Feb. 11, in response to a complaint, CMS asked the Mississippi Department of Health, the regulatory authority that licenses hospitals in the state, to perform an investigation of whether CMMC was inappropriately transferring trauma patients, explained Health Department spokeswoman Liz Sharlot.

"Our licensure folks went out and did it, and they completed their investigation Feb. 20," Sharlot said. "The investigation went back six months. That is what CMS requires."

The Health Department forwarded the results of its investigation to CMS; however, Sharlot said she could not release the results because "it's part of a bigger investigation, and CMS will do its own final report."

CMMC's potential EMTALA problems are not new; during a 2011 inspection of CMMC, the federal Centers for Medicare and Medicaid Services found 16 violations, including insufficient staffing, according to an Association of Health Care Journalists report.

CMMC spokeswoman Fuss said there have been no findings since then.

"CMS conducted a follow-up visit to the hospital and found that all deficiencies previously identified by CMS had been addressed and corrected appropriately," Fuss wrote, adding:

"Decisions regarding a patient transfer are made by the attending physician, and the transfer occurs only after the patient is stabilized in compliance with the requirements of EMTALA."

'Play or Pay'

Mississippi's trauma care network is the only one of its kind in the country, according to state trauma officials. What sets it apart is the mandatory "play or pay" component. Hospitals have to participate or pay a fine commensurate with their level.

For a Level 3 like CMMC, the fine is $758,000. Level 2s owe as much as $1.5 million.

The money goes into the state trauma fund, which also collects money from traffic tickets, like for speeding.

Some, like Baptist Medical Center, a potential Level 2, pay the fine instead of playing, underscoring the costs of doing so. In addition to costly staffing requirements, participating hospitals take on huge costs in caring for the uninsured and those who don't pay their bills.

"Trauma is the leading cause of death in Mississippi," Craig said. "(And) it's largely uncompensated. A lot of the younger population don't feel that insurance is required."

The trauma fund is designed to help, but 10 years ago when the fund was established, UMMC alone spent more than $100 million on uncompensated care, Craig said. "Our trauma fund has never even exceeded $26 million" — a pot that's split 83 ways.

Here's how the money is doled out: Each participating hospital receives a flat stipend based on its level, plus additional money based on the raw number of patients in its trauma registry and a severity score designed to alleviate the costs of treating more complicated cases.

Case 3:15-cv-00767-DPJ-FKB   Document 54-1   Filed 11/21/17   Page 8 of 8

In transfer cases, both hospitals are allowed to count the patient as part of their totals. But Kyle, the UMMC trauma director, said the severity scores should not be as high at the transferring facility because they shouldn't run diagnostic tests in clear transfer situations, like surgical trauma for a Level 4, or neurotrauma for a Level 3. That helps ensure the end destination, which may have to fund a lengthy stay in the ICU, receives more money than the intermediary.

But on at least six occasions in 2013, the charts show CMMC ran CT scans on neurotrauma patients destined for UMMC. One patient was kept there for diagnostic testing as long as seven hours before being transferred to the Level 1 for proper treatment.

It is not clear if this resulted in inflated severity scores. However, Carlton said there are situations in which it would be appropriate for a hospital to call for a CT scan before transferring a patient.

"It's not always wrong to do a CT scan, but it's one of those parameters that we review," he said.

Oversight of the trauma system falls to multiple advisory boards, but final authority ultimately rests with the state Department of Health. Any "failure to comply with laws or regulations" or "documented conditions of serious threat or jeopardy to patients' health" are grounds for suspending a trauma center's designation, according to the trauma plan.

Trauma system hierarchy

• Level 4

Trauma centers are generally only asked to resuscitate major trauma patients to prep them for a longer journey to a higher-level center. These are typically small, rural facilities. Examples: Leake Memorial Hospital, Madison County Medical Center.

• Level 3

Trauma centers have to be able to resuscitate patients and perform surgery, if necessary, to control hemorrhaging. Level 3 centers are also required to have advanced divisions, including general surgery, orthopedic surgery, emergency medicine, anesthesia, a post anesthesia care unit and an intensive care unit. Examples: Central Mississippi Medical Center, River Oaks Hospital.

• Level 2

Centers are identical to Level 3s, but they can also perform neurological surgery. Examples: Forrest General Hospital, North Mississippi Medical Center

• Level 1

Centers also have surgical residents and researchers. They also have specialists you might not find at every hospital, such as pediatrics. University of Mississippi Medical Center is the only Level 1 in the state.

EXHIBIT "1", Page 8